# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-01-00443-CV

**Beard Family Partnership, Appellant**

**v.**

**Commercial Indemnity Insurance Company, Appellee**

### FROM THE DISTRICT COURT OF TRAVIS COUNTY, 353RD JUDICIAL DISTRICT
### NO. 99-11363, HONORABLE DARLENE BYRNE, JUDGE PRESIDING

## O P I N I O N

This case involves a surety's rights and obligations under payment and performance bonds entered into pursuant to a construction contract. Appellee Commercial Indemnity Insurance Company ("Commercial Indemnity"), the surety, sued appellant Beard Family Partnership ("Beard"), the owner of land to be developed as a subdivision, for breach of contract and attorneys' fees based on Beard's failure to pay Commercial Indemnity the contract balance for the completed construction of a residential subdivision's infrastructure after the contractor defaulted. Following a jury trial, the jury specifically found that both parties failed to comply with the underlying construction contract, but that Commercial Indemnity substantially performed the contract. The jury awarded damages and reasonable attorneys' fees to Commercial Indemnity. Based on the jury's damages finding of $155,733.51, the court rendered judgment in favor of Commercial Indemnity, adding prejudgment

interest in the amount of $43,571.25, attorneys' fees in the amount of $57,642.62, and a conditional award for attorneys' fees on appeal.

In ten issues Beard appeals, arguing that (i) the jury's findings are based on no evidence or insufficient evidence; (ii) Commercial Indemnity failed to comply with conditions precedent that precluded its recovery; (iii) the court erred in awarding attorneys' fees because Commercial Indemnity's expert witness was untimely disclosed; and (iv) the court erred in excluding Beard's evidence regarding its damages and settlement offer. Finding these grounds without merit, and addressing the arguments raised by the parties in their briefs and at oral argument, we affirm the judgment of the trial court.

## FACTUAL BACKGROUND

Beard owned land in Austin, which was subdivided to be developed for residences. On February 6, 1995, Beard and Round Rock Construction entered into a contract for the construction of the subdivision's infrastructure, which included the streets, water, and wastewater and drainage facilities. Beard agreed to pay Round Rock $504,930.50 for the contractor's performance. The parties agreed in the contract that the work would be completed in 150 days and that liquidated damages would be $500 per day after 150 days.

The contract also provided for Round Rock to furnish performance and payment bonds to guarantee faithful performance of the job and payment of obligations arising under the contract. Commercial Indemnity issued performance and payment bonds to Round Rock pursuant to the contract. Under the performance bond, Commercial Indemnity guaranteed that if Round Rock failed to perform the contract, Commercial Indemnity would remedy the default. Under the payment

2

bond, Commercial Indemnity guaranteed that if Round Rock failed to pay its suppliers of labor and materials furnished under the construction project, Commercial Indemnity would "promptly and faithfully pay claimants."

Round Rock began its work on the job during the first week of March 1995. The parties immediately discovered inconsistencies between the record drawings, also known as the "plans," and the topography of the field. Beard's engineer, Freddie Dippel, Jr. of the Cunningham-Allen engineering firm, met with Round Rock on March 16 to discuss the problems with the plans. Dippel acknowledged at trial that something was wrong "with regard to how natural ground was perceived in this set of plans." The elevations on the original plan were miscalculated by six to eight vertical feet. Dippel corrected the plans, adjusted the elevations according to the actual topography of the area, submitted the new plans for approval by the City on April 5, and received approval from the City on May 18. Pursuant to the adjusted plans, Round Rock regraded the project.

The change in the elevations on the original plans led to changes in other aspects of the job. On July 18, 1995, Round Rock agreed to a change order to install "dry" utilities in the subdivision. Although Cunningham-Allen had designed the infrastructure of the subdivision and received approval of the plans from the City in 1991, the plans had not included the "dry utilities," such as electricity, gas, telephone, and television cable. The City drafted the dry utilities plans after Cunningham-Allen presented its plans to the City. An additional sum of $29,450 was agreed upon to install underground electric lines, work that included excavation, backfill, conduit installation, pullboxes, and transformer pads. Because of the elevation changes to the original plans, the dry utilities plans did not mesh with the original plans.

3

Shortly thereafter, in late summer, John Schuler, Commercial Indemnity's president, learned that Round Rock was having problems meeting its payroll. When the job was close to completion in October 1995, Round Rock went out of business, defaulting on payment to numerous subcontractors and suppliers. At that time, Round Rock had submitted and Beard had paid on six applications for payments totaling over $400,000. Beard then made a claim on the performance bond. Commercial Indemnity took over the job, exercising its option under the performance bond to complete the contract by hiring a replacement contractor, Coleman Construction Company, to finish the work. Coleman hired many of Round Rock's employees. After Commercial Indemnity took over the job, unpaid subcontractors filed several liens. At trial, Schuler testified that all claims and liens were paid in October and November 1995.

In December 1995, Beard began selling lots to homebuilders. In mid-January 1996, the subdivision's streets were paved. Commercial Indemnity submitted applications for payment for the amount remaining on the contract, as well as for other work performed. An unpaid balance of $155,733.51 remained. By application dated December 13, 1995 ("Application No. 7"), Commercial Indemnity applied for payment in the amount of $30,391.20. By application dated March 20, 1996 ("Application No. 8"), Commercial Indemnity applied for payment in the amount of $125,342.91. Although Coleman finished the job and Dippel approved the applications for payment on March 22, 1996, Beard did not pay the amounts requested. The parties disagreed about when the construction was "substantially complete" as required by the contract: Commercial Indemnity contended that the project was substantially complete in December when Beard began selling the lots; Beard contended the job was at least 202 days late. Beard refused to pay the amount

4

Commercial Indemnity claimed without some deduction for the delay and receipt of an all-bills-paid affidavit, which Beard requested and Commercial Indemnity failed to provide.

Commercial Indemnity then filed suit against Beard, seeking the unpaid balance of the contract in the amount of $155,733.51, plus additional damages in the amount of $60,000 for installation of the telephone and television cable outside the scope of the contract and upon Beard's request. Commercial Indemnity also sought attorneys' fees. In its defense, Beard contended that (i) Coleman finished the work 202 days beyond the 150-day period provided in the contract for completion of the project and that Commercial Indemnity was therefore responsible for the delay, and (ii) Commercial Indemnity failed to submit an all-bills-paid affidavit.

**ANALYSIS**

*Substantial Performance*

The jury expressly found that Commercial Indemnity substantially performed the construction contract and awarded contract damages in the amount of $155,733.51. It also found that Beard failed to comply with the construction contract. In its first and fourth issues, Beard asserts that, by Commercial Indemnity's failure to submit an all-bills-paid affidavit upon Beard's request, Commercial Indemnity failed to meet a condition precedent to being paid the balance under the contract. In these issues, Beard asks us to interpret the contract in question, which neither party asserts is ambiguous. The interpretation of an unambiguous contract is a question of law, to which we apply a *de novo* standard of review. *MCI Telecomms. Corp. v. Texas Utils. Elec. Co.*, 995 S.W.2d 647, 650 (Tex. 1999); *Coker v. Coker*, 650 S.W.2d 391, 393 (Tex. 1983).

5

A condition precedent that affects a party's obligation to perform is an act or event that must occur after the making of a contract before a right to immediate performance arises and before there may be a breach of contractual duty. *Centex Corp. v. Dalton*, 840 S.W.2d 952, 956 (Tex. 1992); *Hohenberg Bros. Co. v. George E. Gibbons & Co.*, 537 S.W.2d 1, 3 (Tex. 1976). Ordinarily, if the acceptance of a contract is conditioned upon the happening of a future event, the condition must be performed or fulfilled exactly as set forth in the contract before the promise can be enforced. *See Centex*, 840 S.W.2d at 956.

Beard thus argues that the contract creates a condition precedent requiring Commercial Indemnity to fulfill all terms and conditions of the underlying contract between Beard and Round Rock, including the provision of an all-bills-paid affidavit. The contract between Beard as Owner and Round Rock as Contractor provided:

> ¶ 9.10 **FINAL COMPLETION AND FINAL PAYMENT**
>
> ¶ 9.10.1 . . . . The architect's final Certificate for Payment will constitute a further representation that conditions listed in subparagraph 9.10.2 as precedent to the Contractor's being entitled to final payment have been fulfilled.
>
> ¶ 9.10.2 Neither final payment nor any remaining retained percentage shall become due until the Contractor submits to the Architect (1) an affidavit that payrolls, bills for materials and equipment, and other indebtedness connected with the Work for which the Owner . . . might be responsible . . . have been paid or otherwise satisfied . . . .

Beard also urges that an all-bills-paid affidavit is required by section 53.085 of the Texas Property Code, which provides:

6

> (a) Any person who furnishes labor or materials for the construction of improvements on real property shall, if requested and as a condition of payment for such labor or materials, provide . . . an affidavit stating that the person has paid each of the person's subcontractors, laborers, or materialmen in full . . . .

Tex. Prop. Code Ann. § 53.085(a) (West Supp. 2003). Because Beard requested the affidavit and Commercial Indemnity did not provide it, Beard contends it is not liable for the retained contract balance.

The issues in this case involve more than the construction contract between Beard as owner and Round Rock as Contractor. When Commercial Indemnity stepped in as surety after Round Rock defaulted, the terms of the performance bond and the payment bond came into play as well. It is true that Commercial Indemnity as a surety "stands in the shoes" of its principal, here Round Rock, in the event of default by Round Rock either in performance of the construction contract—the performance bond—or in the failure to pay its subcontractors or suppliers—the payment bond. Suretyship is a tripartite relationship in which the obligation of the surety is intended to supplement an obligation of the principal (also described as the debtor or obligor) owed to the creditor (also described as the obligee). *Restatement (First) of Security* § 82 (1941). Thus, two parties are liable for a debt, although one—here Commercial Indemnity—owes the other the duty of ultimate payment.

With the performance bond, the surety is liable for a default in the performance by the principal of its contract obligations. Here, the performance bond provides:

> Whenever Contractor shall be, and declared by Owner to be in default under the Contract, the Owner having performed Owner's obligations thereunder, the Surety *may promptly remedy the default or* may promptly

7

(1) Complete the contract in accordance with its terms and conditions, or may

(2) Obtain a bid or bids for completing the contract in accordance with its terms and conditions . . . .

(Emphasis added.) Commercial Indemnity elected to remedy the default by hiring a replacement contractor and completing the job. As contemplated by the bond, Commercial Indemnity advanced funds to complete Round Rock's contract when it defaulted on the performance it owed Beard.

By the terms of the payment bond, on the other hand, Commercial Indemnity agreed to "promptly and faithfully pay claimants for all labor, subcontracts, materials . . . performed or furnished under or by virtue of said contract . . . ." Thus, the very purpose of the payment bond is to protect the owner-obligee as against subcontractors, suppliers, and those providing labor under a construction contract. One commentator describes the role of payment bonds as follows:

> The condition of a payment bond is typically that the principal [the entity providing the bond] will promptly pay persons who furnish labor and material for the use in the performance of the contract work. On a private project, of course, the obligee wants to be sure that these persons are paid because they can file mechanic's/construction liens against the owner's property. *The payment bond assures that a financially responsible party, the surety, is committed to paying these lien claimants should the principal fail to do so.*

Payment Bond Manual 3 (Edward G. Gallagher ed., 2d ed. 1995) (emphasis added). Lien claimants thus have recourse as against the surety. *Id.*

Because they are contracts, performance and payment bonds are construed to effectuate the parties' intentions. When the provisions are clear and unambiguous, a court must enforce the terms of the bond as written. The intent of the parties to a surety bond as well as their

8

rights and obligations are determined by the language of the bond itself. *Geters v. Eagle Ins. Co.*, 834 S.W.2d 49, 50 (Tex. 1992). Although the performance and payment bonds at issue incorporate the terms and conditions of the construction contract, any conflicting clauses must be harmonized to reflect the intent of the parties. *See Ogden v. Dickinson State Bank*, 662 S.W.2d 330, 332 (Tex. 1983).

When we read together and harmonize the underlying contract's provision regarding the requirement of an all-bills-paid affidavit from the contractor, together with the bonds, the intent of the parties makes clear that the affidavit is not a requirement also imposed upon the surety. In addition to the affidavit, paragraph 9.10.2 also requires the "consent of surety, if any, to final payment." Because the surety is the assurance of payment—and continues to be liable on the bond until the expiration of a specified time period—the affidavit would under these circumstances perform no function.

At trial, for example, Beard introduced as evidence a letter from Commercial Indemnity listing several outstanding claims, including one the surety did not intend to pay because it was filed late and one that was disputed. The jury heard testimony that a surety owes obligations to both its principal and the obligee and is not free to honor just any claim presented to it for payment by either an obligee or a payment bond claimant. Rather, as Schuler testified at trial, after a contractor defaults, it is a difficult process to verify whether work has been performed and a claim is valid. A claim may or may not be valid and the surety must reasonably investigate its validity. The performance bond obligation then is secondary to the obligation the principal owes to the obligee, which is discharged by the presentation of the all-bills-paid affidavit. Thus, for the surety

9

to have an obligation to act pursuant to its performance bond, the principal first must have failed to fulfill its obligations. A surety is then vested with broad discretion to resolve the claims.

The performance bond also requires as a condition precedent that the Owner perform its obligations before the surety is required to perform under the bond. By the terms of the performance bond, the surety's obligation arises only when the "Contractor [is] . . . declared by Owner to be in default under the Contract, the Owner having performed Owner's obligations thereunder." Because the jury found that Beard failed to perform and that Commercial Indemnity substantially performed the underlying contract, Beard is not excused from performance. We overrule Beard's first and fourth issues.

### *Legal and Factual Sufficiency*

In its second, third, and seventh issues, Beard argues that the jury's finding that Beard failed to comply with the contract and the consequent damage findings are supported by no evidence or insufficient evidence. The jury found that Beard defaulted under the contract and, by finding breach and awarding the retainage amounts under the contract, impliedly charged Beard with responsibility for delay on the construction project. We have reviewed the record and find ample evidence to support the jury's findings.

We will first address the standards of review for challenges to legal and factual sufficiency. To preserve error on factual insufficiency of the jury's verdict, a motion for new trial is required. Tex. R. Civ. P. 324(b)(2); *Fredonia State Bank v. General Am. Life Ins. Co.*, 881 S.W.2d 279, 281 (Tex. 1994). A motion for new trial must clearly state the grounds so that the objection may be clearly identified and understood by the court. Tex. R. Civ. P. 322. Following

trial, Beard moved for a new trial. The motion states that "Beard here moves for a new trial," but does not state any grounds for the motion and is therefore inadequate to preserve error. *Gulf Coast State Bank v. Emenhiser*, 562 S.W.2d 449, 452 (Tex. 1978).

Challenges to the legal sufficiency of the evidence must be sustained when the record discloses one of the following: (1) a complete absence of evidence of a vital fact; (2) the court is barred by rules of law or evidence from giving weight to the only evidence offered to prove a vital fact; (3) the evidence offered to prove a vital fact is no more than a mere scintilla of evidence; or (4) the evidence established conclusively the opposite of a vital fact. *See Havner v. Merrell Dow Pharms., Inc.*, 953 S.W.2d 706, 711 (Tex. 1997). In reviewing legal sufficiency, we are required to determine whether the proffered evidence as a whole rises to a level that would enable reasonable and fair-minded people to differ in their conclusions. *See Transportation Ins. Co. v. Moriel*, 879 S.W.2d 10, 25 (Tex. 1994).

If a party is attacking the legal sufficiency of an adverse finding of an issue on which it did not have the burden of proof, the attacking party must demonstrate on appeal that there is no evidence to support the adverse finding. *See Croucher v. Croucher*, 660 S.W.2d 55, 58 (Tex. 1983). In reviewing a no-evidence issue, we are to consider only the evidence favoring the finding, disregarding all direct and circumstantial evidence to the contrary. *Lenz v. Lenz*, 79 S.W.3d 10, 13 (Tex. 2002); *Continental Coffee Prods. Co. v. Cazarez*, 937 S.W.2d 444, 450 (Tex. 1996).

Delay caused by an owner on a construction project is a breach of contract. *Board of Regents v. S & G Constr. Co.*, 529 S.W.2d 90, 100 (Tex. Civ. App.—Austin 1975, writ ref'd n.r.e.). An owner impliedly warrants the adequacy of the plans it supplies and which it requires its

11

contractor to follow. *See United States v. Spearin*, 248 U.S. 132, 136 (1918). An owner breaches its construction contract with its contractor when the inadequacies of the owner's plans, obtained through the owner's retained engineer, cause delay in the completion of the work. *See id.*

Here, the jury heard evidence relating to various sources of delay in the project: (i) at the inception of work, because of miscalculations in the elevations of the actual topography, the engineer was required to adjust the plans and resubmit them to the City for approval; (ii) a contract change order for the installation of dry utilities occurred in mid-July as a consequence of the elevation adjustment in the original plans and the failure of the two separate plans to "mesh"; (iii) a detention pond was found to be encroaching onto a homeowner's property according to the original plans and was required to be redesigned; and (iv) because of the passage of time and change in regulations since the original drawings had been prepared, dirt and rock known as "spoils" had to be removed from the construction site rather than added to the lots. Rick Coleman of Coleman Construction testified that the plans were simply insufficient and contained too many mistakes. As to the miscalculation of elevation, Coleman testified that once Beard's engineer raised the grade, "it changed everything downstream." Although Beard disputed that it was responsible for the various delays, the jury found otherwise and there is abundant evidence to support its findings. We overrule Beard's second and third issues.

As its seventh issue, Beard asserts that the jury's finding of zero damages for Beard was legally and factually insufficient. Under Beard's theory, because Commercial Indemnity did not prove that Beard was responsible for one hundred percent of the delay, there is insufficient evidence not to award Beard damages.

12

When a party attacks the legal sufficiency of a finding on which it has the burden of proof, it must demonstrate that all the evidence establishes, as a matter of law, all vital facts in support of the finding. *Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 241 (Tex. 2001). After reviewing the record, if we find any evidence that supports the finding, ignoring all evidence to the contrary, the finding must be upheld. *Id.* (citing *Sterner v. Marathon Oil Co.*, 767 S.W.2d 686, 690 (Tex. 1989)). If there is no evidence to support the jury's finding, then the entire record must be examined to see if the contrary proposition is established as a matter of law. *Id.* If the contrary proposition is established conclusively by the evidence, the issue will be sustained. *Id.* (citing *Croucher*, 660 S.W.2d at 58).

Question 11 of the charge asked the jury what sum of money would fairly and reasonably compensate Beard for Commercial Indemnity's failure to comply with the construction contract. In arriving at a sum, the jury could only consider the liquidated damages clause of the construction contract, which provided for liquidated damages of $500 per day for each day of delay after 150 calendar days. As discussed above, there is ample evidence to support the jury's findings that Beard caused delay in construction. This evidence further supports the jury's finding of zero damages for Beard. Accordingly, we overrule Beard's seventh issue.

*Evidentiary Rulings*

Beard complains in its eighth issue that the district court improperly excluded evidence of Beard's actual damages. We apply an abuse of discretion standard to the question of whether a district court erred in an evidentiary ruling. *National Liab. & Fire Ins. Co. v. Allen*, 15 S.W.3d 525, 527-28 (Tex. 2000); *City of Brownsville v. Alvarado*, 897 S.W.2d 750, 753 (Tex. 1995).

13

We may reverse a district court under this standard only when we find that "the court acted in an unreasonable or arbitrary manner," *Beaumont Bank, N.A. v. Buller*, 806 S.W.2d 223, 226 (Tex. 1991), or "without regard for any guiding rules or principles." *Owens-Corning Fiberglas Corp. v. Malone*, 972 S.W.2d 35, 43 (Tex. 1998) (quoting *Alvarado*, 897 S.W.2d at 754).

When seeking to reverse a judgment based on an improper evidentiary ruling, a complaining party "need not prove that but for the error a different judgment would necessarily have been rendered, but only that the error probably resulted in an improper judgment." *Alvarado*, 897 S.W.2d at 753; *accord Malone*, 972 S.W.2d at 43. To prevail, the party must demonstrate that "the judgment turns on the particular evidence excluded or admitted." *Alvarado*, 897 S.W.2d at 753-54. We review the entire record to determine whether a party has met this burden. *Id.* at 754. If any legitimate basis exists to support a district court's evidentiary ruling, then we must uphold the court's decision. *Malone*, 972 S.W.2d at 43; *State Bar v. Evans*, 774 S.W.2d 656, 658 n.5 (Tex. 1989) (citing *McCormick on Evidence* § 52, at 131 (3d ed. 1984)).

The contract had a liquidated damages clause of $500 per day. Jim Beard testified that the company suffered damages of $1000 per day. Because the parties stipulated that the liquidated damages provision was enforceable (although this represented a change in Commercial Indemnity's position when it amended its discovery responses shortly before trial), the district court excluded testimony concerning actual damages. But Beard has cited no authority in support of its position. Tex. R. App. P. 38.1(h) (brief must contain appropriate citations to authority). We cannot say that the district court abused its discretion when it excluded Beard's actual damages evidence. We overrule Beard's eighth issue.

14

Likewise, Beard urges in its ninth issue that the district court erroneously admitted evidence "over objection" that Commercial Indemnity incurred more damages than the amount it sought to recover under the contract. Beard complains that Commercial Indemnity argued in its opening statement that it paid more money than it made on the project and that Schuler did additional work "out of the goodness of his heart." It further complains that Schuler testified that Commercial Indemnity did additional work without submitting a bill.

Beard's only objection to this evidence was in the form of its motion in limine, which the district court partially granted. It is well established that a motion in limine is in itself insufficient to preserve error. *Hartford Accident & Indem. Co. v. McCardell*, 369 S.W.2d 331, 335 (Tex. 1963). To preserve error on this issue, Beard must have objected when the evidence was offered and obtained a ruling on its objection. *Id.*; *see also* Tex. R. App. P. 33.1(a). This Beard failed to do, thus waiving error. Therefore, we overrule Beard's ninth issue.

In its tenth issue, Beard contends that the district court erroneously excluded evidence of its settlement offer to pay $84,733.51 and add sixty days to the completion deadline to compensate for the extra time required by the change order. Offers of settlement are "not admissible to prove liability for or invalidity of the claim or its amount." Tex. R. Evid. 408. Settlement offers may be admitted for another purpose, however, such as proving bias or prejudice or negating a contention of undue delay. *Id.* Here, Beard sought to introduce its settlement offer to disprove the validity and amount of Commercial Indemnity's claim. We hold that the district court did not abuse its discretion in excluding evidence of Beard's settlement offer. We overrule Beard's tenth issue.

*Attorneys' Fees*

In its fifth issue, Beard complains that Commercial Indemnity's expert witness on attorneys' fees was not timely designated and therefore should have been excluded. Commercial Indemnity responds that it designated its expert thirty days before trial. Beard sought exclusion of the attorneys' fees testimony through a motion in limine.

Commercial Indemnity admits that it failed to designate its expert witnesses within the time period required by rule of civil procedure 195.2. Tex. R. Civ. P. 195.2 (deadline of ninety days before trial for party seeking affirmative relief). When a party fails to supplement a discovery response in a timely manner, the evidence may be excluded. *Id.* 193.6(a); *see also Alvarado v. Farah Mfg. Co.*, 830 S.W.2d 911, 914 (Tex. 1992). The remedy is mandatory and automatic unless the court finds that there was good cause for the failure to amend or supplement, or the failure will not unfairly surprise or prejudice the other party. Tex. R. Civ. P. 193.6(a); *Morrow v. H.E.B., Inc.*, 714 S.W.2d 297, 297-98 (Tex. 1986). The burden of establishing good cause or lack of unfair surprise is on the party seeking to introduce the evidence. Tex. R. Civ. P. 193.6(b). The trial court has discretion to determine whether the offering party has met its burden of showing good cause. *Aluminum Co. of Am. v. Bullock*, 870 S.W.2d 2, 3 (Tex. 1994). The record must support a finding of good cause or lack of unfair surprise. Tex. R. Civ. P. 193.6(b).

After extensive argument and briefing and offering Beard a postponement of testimony to allow Beard to depose the attorneys' fee expert, the district court ruled that there was good cause to allow the attorneys' fees expert witness to testify because the failure to timely designate was because of inadvertence of counsel. The court further ruled that there was a lack of

unfair surprise or prejudice to Beard because, unlike the testimony of other experts, Commercial Indemnity's pleadings contained the request for attorneys' fees from the lawsuit's inception. While the late designation is not good practice, under these circumstances we cannot conclude that the trial court's admission of the testimony was an abuse of discretion. We therefore overrule Beard's fifth issue on appeal.

By its sixth issue, Beard argues that there is no evidence or insufficient evidence to support the district court's award of attorneys' fees because Commercial Indemnity failed to segregate time spent on its contract claim from time spent on its *quantum meruit* claim for which the jury awarded no recovery. When a plaintiff seeks to recover attorneys' fees in a case involving multiple claims, at least one of which supports an award of fees and at least one of which does not, the plaintiff must offer evidence segregating attorneys' fees among the various claims. *See Stewart Title Guar. Co. v. Sterling*, 822 S.W.2d 1, 10-11 (Tex. 1991). An exception to this duty to segregate arises when the attorneys' fees rendered are in connection with claims arising out of the same transaction and are so interrelated that their prosecution or defense entails proof or denial of essentially the same facts. *Id*. at 11. Thus, a plaintiff must either segregate the fees among the several claims or establish that the claims are sufficiently interrelated.

Beard did not preserve this issue. If a party does not object to the failure to segregate, it waives any appellate complaint. *Green Int'l v. Solis*, 951 S.W.2d 384, 389 (Tex. 1997). In any event, segregation was not warranted. Because the attorneys' fees were awarded for claims arising out of the same transaction and were so interrelated that essentially the same proof is required, segregation is not required. *Stewart Title*, 822 S.W.2d at 11. We overrule Beard's sixth issue.

17

**CONCLUSION**

Having found no reversible error, we overrule Beard's issues on appeal and affirm the judgment of the district court.

_____

Jan P. Patterson, Justice

Before Justices Kidd, Patterson and Puryear:  Opinion by Justice Patterson;
    Dissenting Opinion by Justice Puryear

Affirmed

Filed:   August 29, 2003

18