**AFFIRM; and Opinion Filed June 20, 2016.**



In The

# Court of Appeals
# Fifth District of Texas at Dallas

___

## No. 05-15-00626-CV

___

**ARGENT DEVELOPMENT, L.P., Appellant**
**V.**
**LAS COLINAS GROUP, L.P. AND BILLY BOB BARNETT, Appellees**

___

**On Appeal from the 134th Judicial District Court**
**Dallas County, Texas**
**Trial Court Cause No. DC-13-13507**

___

## MEMORANDUM OPINION

Before Justices Francis, Fillmore, and Schenck
Opinion by Justice Fillmore

The Las Colinas Group, L.P. (LCG) and the City of Irving (the City) entered into an agreement to develop an entertainment complex (the development agreement). Argent Development, L.P. loaned money to LCG to fund pre-development expenses, and LCG executed a promissory note obligating it to pay Argent $1,570,000. Billy Bob Barnett signed a guaranty agreement that required him, under certain conditions, to pay LCG's debt to Argent if LCG failed to do so. After both LCG and Barnett failed to pay the debt, Argent sued on the note and the guaranty.

Argent and Barnett both moved for summary judgment on Argent's claims on the guaranty. The trial court denied Argent's motion, granted Barnett's motion, and dismissed Argent's claims against Barnett. In three issues, Argent argues the trial court erred in its rulings because Barnett's liability under the guaranty was triggered when LCG, in a settlement

agreement with the City, released all "covenants, contracts [and] agreements" related to the development agreement; the development agreement had not expired before LCG executed the release; and Barnett should be judicially estopped from claiming the development agreement had expired. We affirm the trial court's judgment.

**Background**

On December 11, 2008, LCG and the City entered into the development agreement, which gave LCG the right to design and build an entertainment center in the City. LCG and the City agreed the City would ultimately own the entertainment center, and LCG would operate the center under a long-term lease. Both LCG, through private funding, and the City, by issuing bonds, were required to contribute to the costs of the entertainment center.

Argent loaned money to LCG to fund pre-development expenses relating to the entertainment center. On December 1, 2010, LCG executed a promissory note requiring it to pay Argent the principal amount of the note and any unpaid accrued interest within thirty days after the earliest of: (1) the date the City issued bonds the proceeds of which were applied, or publicly announced to be for application, to the entertainment center, (2) the "sale, assignment, or other transfer by [LCG] of all or any interest in" the development agreement or a change in ownership of more than fifty percent of LCG, or (3) December 31, 2014. On July 27, 2011, Barnett signed the guaranty, agreeing to pay LCG's debt to Argent if LCG failed to pay the debt within thirty days of the date the City issued the bonds; LCG sold, assigned, or otherwise transferred any interest in the development agreement; or there was a change in ownership of more than fifty percent of LCG.

After being amended and extended several times, the development agreement required LCG to close on its private funding by August 6, 2012, and provided that, if the closing did not occur, the development agreement would "automatically terminate[] without any necessity for

–2–

any further action by either party." On August 6, 2012, the City Council voted not to extend the development agreement for any additional period of time. On August 7, 2012, LCG sued the City. In its third amended petition, LCG sought to recover over $139 million in damages. Alternatively, it sought specific performance of the development agreement by requiring the City to issue the bonds and asserted the City should be estopped by its conduct from claiming the development agreement had expired.

In July 2013, LCG and the City settled the litigation. As relevant to this appeal, the settlement agreement noted the City would enter into an agreement with the ARK Group of Irving, Inc. relating to the development by ARK of an entertainment center project "similar to" the previously planned entertainment center, and LCG would enter into an agreement with ARK pursuant to which LCG would receive $3,000,000. In the settlement agreement, LCG:

> unconditionally and irrevocably release[d] and forever discharge[d] the City . . . from any and all claims, debts, demands, actions, causes of action, suits, accounts, covenants, contracts, agreements, damages, losses, judgments, executions, orders, fees, costs, expenses, and liabilities whatsoever of any kind, whether in law or in equity, whether now known or unknown, accrued or unaccrued, suspected or unsuspected, of any nature whatsoever, which [LCG had] or ever had against the [City] . . . from the beginning of time to the Effective Date of this Agreement, in any way arising from or related to (i) the LCG Development Agreement, (ii) the Lease, (iii) the LCG Project, (iv) the facts and events at issue in the Suit and Appeal, (v) the ARK Development Agreement, (vi) the ARK Project, or (vii) any business dealings between the City, ARK, or [LCG], including, without limitation, all allegations made the subject of the Suit or the Appeal, including, but not limited to, any and all claims which were or could have been asserted in the Suit or the Appeal.

The release was "intended to be a broad, general release of all claims [LCG had] or could ever have against" the City and was "specifically intended to cover claims based on future events related to the ARK Development Agreement and the ARK Project." The settlement agreement between LCG and ARK contained a substantively identical release by LCG.

The City also entered into a settlement agreement with Barnett and several companies that had entered into agreements with LCG or the City relating to the entertainment center.[1] This agreement also provided the City would enter into an agreement with ARK relating to the development by ARK of an entertainment center project "similar to" the previously planned entertainment center and that Barnett and one of the companies would enter into an agreement with ARK pursuant to which they would receive $1,000,000.

On November 13, 2013, Argent sued LCG for failing to pay the promissory note and Barnett for failing to perform under the guaranty. Argent filed a motion for summary judgment on its claims against Barnett on the ground that LCG's release in the settlement agreement with the City constituted a "sale, assignment, or other transfer" of any interest in the development agreement that triggered LCG's duty to pay the note and, therefore, Barnett's duty to perform under the guaranty after LCG failed to pay its debt. In its reply to Barnett's response to the motion, Argent argued that LCG had requested specific performance of the development agreement in the litigation against the City and Barnett, therefore, should be judicially estopped from claiming the development agreement expired before the litigation with the City was settled. The trial court denied Argent's motion for summary judgment.

Barnett moved for summary judgment on Argent's claims on grounds a condition precedent to his liability under the guaranty had not occurred, LCG had not transferred any interest in the development agreement, and the development agreement terminated on August 6, 2012, and could not have been transferred in July 2013. In its response to Barnett's motion, Argent made the same arguments as in its motion for summary judgment. The trial court granted Barnett's motion for summary judgment without specifying the basis for its ruling and dismissed Argent's claims against Barnett. At LCG's and Argent's request, the trial court entered an

---

[1] Barnett signed the settlement agreement on behalf of himself and as the managing partner for each company included in the agreement.

agreed judgment against LCG awarding Argent $1,918,281 as well as $30,000 in attorneys' fees. Argent then appealed the trial court's denial of Argent's motion for summary judgment and granting of Barnett's motion for summary judgment.

## Standard of Review

We review the grant of a summary judgment de novo. *Masterson v. Diocese of Nw. Tex.*, 422 S.W.3d 594, 607 (Tex. 2013), *cert. denied*, 135 S. Ct. 435 (2014). A party moving for traditional summary judgment has the burden of establishing that no genuine issue of material fact exists and the movant is entitled to judgment as a matter of law. TEX. R. CIV. P. 166a(c); *Nixon v. Mr. Prop. Mgmt. Co.*, 690 S.W.2d 546, 548–49 (Tex. 1985). In reviewing the grant of a traditional summary judgment, we consider all the evidence in the light most favorable to the non-movant. *Mann Frankfort Stein & Lipp Advisors, Inc. v. Fielding*, 289 S.W.3d 844, 848 (Tex. 2009). We credit evidence favorable to the nonmovant if a reasonable fact-finder could, and we disregard evidence contrary to the nonmovant unless a reasonable fact-finder could not. *Id.*

When, as here, both parties move for summary judgment on the same issue, each party bears the burden of establishing it is entitled to judgment as a matter of law. *Moayedi v. Interstate 35/Chisam Road, L.P.*, 438 S.W.3d 1, 3–4 (Tex. 2014). When the trial court grants one motion and denies the other, we consider the summary judgment evidence presented by both sides and determine all questions presented. *Fielding*, 289 S.W.3d at 848. If we determine the trial court erred, we render the judgment the trial court should have rendered. *Valence Operating Co. v. Dorsett*, 164 S.W.3d 656, 661 (Tex. 2005); *Exco Res., Inc. v. Cudd Pressure Control, Inc.*, No. 05-14-01364-CV, 2016 WL 2726539, at *2 (Tex. App.—Dallas May 9, 2016, no pet. h.) (mem. op.).

**Analysis**

In its first issue, Argent contends the trial court erred by denying Argent's motion for summary judgment and granting Barnett's motion for summary judgment because the release in LCG's settlement agreement with the City constituted a transfer by LCG of "any interest" in the development agreement, triggering both LCG's obligation to pay the promissory note and Barnett's duties under the guaranty.

"A condition precedent is an event that must happen or be performed before a right can accrue to enforce an obligation." *Solar Applications Eng'g, Inc. v. T.A. Operating Corp.*, 327 S.W.3d 104, 108 (Tex. 2010) (quoting *Centex Corp. v. Dalton*, 840 S.W.2d 952, 956 (Tex. 1992)). If an express condition is not satisfied, then the party whose performance is conditioned is excused from any obligation to perform. *Id.*

A guaranty creates a secondary obligation whereby the guarantor promises to be responsible for the debt of another and may be called upon to perform if the primary obligor fails to do so. *Rainier Income Fund I, Ltd. v. Gans*, No. 05-15-00460-CV, 2016 WL 3165610, at *4 (Tex. App.—Dallas June 7, 2016, no pet. h.); *Abel v. Alexander Oil Co.*, 474 S.W.3d 795, 800 (Tex. App.—Houston [14th Dist.] 2014, no pet.). To recover under a guaranty, a party must prove: (1) the existence and ownership of the guaranty contract; (2) the terms of the underlying contract by the holder; (3) the occurrence of the conditions upon which liability is based; and (4) the failure or refusal to perform the promise by the guarantor. *Gans*, 2016 WL 3165610, at *4; *Abel*, 474 S.W.3d at 800. Under the rule of *strictissimi juris*, a guarantor may require the terms of his guaranty to be strictly followed and the agreement may not be extended beyond its precise terms by construction or implication. *Reece v. First State Bank of Denton*, 566 S.W.2d 296, 297 (Tex. 1978); *Gans*, 2016 WL 3165610, at *4; *Abel*, 474 S.W.3d at 800. Before we can apply this

–6–

rule, we must examine the terms of the guaranty based on the language of the contract. *Gans*, 2016 WL 3165610, at \*4; *Abel*; 474 S.W.3d at 800.

Courts construe an unambiguous guaranty agreement as any other contract. *Moayedi*, 438 S.W.3d at 7. The interpretation of an unambiguous contract is a question of law we review de novo. *Id.*; *Gans*, 2016 WL 3165610, at \*4. Our primary goal is to ascertain and give effect to the parties' intent as expressed in the writing itself. *Moayedi*, 438 S.W.3d at 7; *Gans*, 2016 WL 3165610, at \*4. No single provision taken alone will be given controlling effect; rather, we must favor an interpretation that harmonizes and gives effect to all the provisions of the agreement so that none will be rendered meaningless. *Moayedi*, 438 S.W.3d at 7. We give terms their plain, ordinary, and generally accepted meanings unless the contract itself shows them to be used in a technical or different sense. *Id*. Where the language is clear and unambiguous, we may not look outside of the document to give it a different construction. *Gans*, 2016 WL 3165610, at \*4; *see also Moayedi*, 438 S.W.3d at 7 ("When parties disagree over the meaning of an unambiguous contract, we determine the parties' intent by examining the entire agreement.").

The only issue in this case is whether one of the conditions that would cause Barnett to become liable on the guaranty has occurred. Barnett agreed to pay LCG's debt to Argent if LCG failed to do so within thirty days of when (1) the City issued the bonds, (2) there was a "sale, assignment, or other transfer by [LCG] of all or any interest in" the development agreement, or (3) there was a change in ownership of more than fifty percent of LCG. It is undisputed the first and third events have not occurred. Relying on *Grohman v. Kahlig*, 318 S.W.3d 882 (Tex. 2010) (per curiam), Argent argues LCG's release in the settlement agreement with the City constituted a "transfer" by LCG of any interest in the development agreement, triggering Barnett's obligation to perform under the guaranty.

In *Grohman*, Sondra Grohman sued her ex-husband, Clarence Kahlig II, for allegedly breaching a security agreement entered into pursuant to their divorce settlement. *Id.* at 884. In connection with the divorce settlement, Kahlig executed a promissory note and pledged a majority of his stock in two corporations as collateral. *Id.* A security agreement prohibited Kahlig from selling, transferring, leasing, or otherwise disposing of the collateral, which was defined as the stock in the two corporations and "*all replacements, additions and substitutions therefor now owned or hereafter acquired by* [Kahlig], plus all cash and non-cash proceeds and all proceeds of proceeds arising from those shares." *Id.* at 884–85, 887. Kahlig reorganized his two corporations, creating a holding company corresponding to each corporation, contributing his existing stock in each corporation to each holding company, converting each corporation to a limited partnership, and causing each holding company to exchange its shares of corporate stock for equal units of limited partnership interest. *Id.* at 885.

As relevant to this appeal, Grohman argued Kahlig breached the security agreement by transferring the collateral in connection with the conversion without her consent. *Id.* at 885. The supreme court defined "transfer" as:

> Any mode of disposing of or parting with an asset or an interest in an asset, including a gift, the payment of money, release, lease, or creation of a lien or other encumbrance. The term embraces every method—direct or indirect, absolute or conditional, voluntary or involuntary—of disposing of or parting with property or an interest in property.

*id.* at 888 (quoting *Transfer*, BLACK'S LAW DICTIONARY 1636 (9th ed. 2009)), and concluded that, while the business interests technically moved between Kahlig and his holding companies, Kahlig retained ownership of his entire interest in the companies throughout the conversion and the collateral was not transferred. *Id.*

Argent asserts the definition of transfer used by the supreme court in *Grohman* mandates a finding that LCG's release in its settlement with the City of "any and all . . . covenants,

contracts, [and] agreements . . ." was a transfer by LCG of any interest in the development agreement. Argent essentially argues that a "release" must always constitute a "transfer." However, a "release" is only a "transfer" under the definition used by the supreme court in *Grohman* if it is related to the "disposing of or parting with an asset or an interest in an asset." *Id.* at 888. There are other types of "releases," including the "action of freeing or the fact of being freed from restraint or confinement," *Release*, BLACK'S LAW DICTIONARY (10th ed. 2014), or the "[l]iberation from an obligation, duty, or demand; the act of giving up a right or claim to the person against whom it could have been enforced." *Id.*; *see also El Paso Natural Gas Co. v. Minco Oil & Gas, Inc.*, 8 S.W.3d 309, 314 n.15 (Tex. 1999). Accordingly, a "release" is not a "transfer" of property or an interest in property as a matter of law. Rather, whether a "release" constitutes a "transfer" of property or an interest in property must be determined in light of the language of, and the facts surrounding, any particular release.

We, therefore, turn to the language of the release in LCG's settlement agreement with the City to determine if it disposed of or parted with any interest in the development agreement. *See Gans*, 2016 WL 3165610, at *4; *Abel*, 474 S.W.3d at 800. The settlement agreement stated the development agreement terminated on August 6, 2012, and the City would "enter into a new Entertainment Center Development Agreement" with ARK. The purpose of the settlement agreement was to resolve the disputes and "compromise and settle all claims" between the City and LCG. By executing the settlement agreement, LCG released "any and all claims, debts, demands, actions, causes of action, suits, accounts, covenants, contracts, agreements, damages, losses, judgments, executions, orders, fees, costs, expenses, and liabilities whatsoever of any kind." Nothing in the settlement agreement indicates the parties intended that LCG's release was a transfer of any interest in the development agreement to either the City or ARK. Rather, the

settlement agreement contemplated that the development agreement had terminated and the City would enter into a new agreement with ARK for the development of an entertainment center.

We conclude LCG's release in the settlement agreement with the City was not a "transfer" of any interest in the development agreement that triggered Barnett's duties under the guaranty to pay LCG's debt to Argent if LCG failed to do so. Accordingly, the trial court properly granted summary judgment in favor of Barnett on the ground that a condition precedent to his liability under the guaranty had not occurred. We resolve Argent's first issue against it.[2]

We affirm the trial court's judgment.


/Robert M. Fillmore/
ROBERT M. FILLMORE
JUSTICE

150626F.P05

---

[2] If, as in this case, the trial court's order does not specify the grounds for granting summary judgment, we must affirm the summary judgment if any of the theories presented to the trial court and preserved for appellate review are meritorious *See Provident Life & Accident Ins. Co. v. Knott*, 128 S.W.3d 211, 216 (Tex. 2003). Therefore, we need not address Argent's second and third issues in which it contends the trial court erred by granting summary judgment in favor of Barnett because the development agreement had not terminated and Barnett should be judicially estopped from asserting it had terminated. *See* TEX. R. APP. P. 47.1.



# Court of Appeals
# Fifth District of Texas at Dallas

## JUDGMENT

ARGENT DEVELOPMENT, L.P.,
Appellant

No. 05-15-00626-CV       V.

LAS COLINAS GROUP, L.P. AND BILLY
BOB BARNETT, Appellees

On Appeal from the 134th Judicial District
Court, Dallas County, Texas,
Trial Court Cause No. DC-13-13507.
Opinion delivered by Justice Fillmore,
Justices Francis and Schenck participating.

In accordance with this Court's opinion of this date, the judgment of the trial court is **AFFIRMED**.

It is **ORDERED** that appellee Las Colinas Group, L.P. and Billy Bob Barnett recover their costs of this appeal from appellant Argent Development, L.P..

Judgment entered this 20th day of June, 2016.