**Affirmed in part; Reversed and Remanded in part and Opinion Filed April 8, 2022**



**In The**

**Court of Appeals**
**Fifth District of Texas at Dallas**

**No. 05-20-00485-CV**

**JAQUELINE GLENNIS GARCIA SANCHEZ, Appellant**
**V.**
**JOHN MICHAEL WALES, Appellee**

**On Appeal from the 429th Judicial District Court**
**Collin County, Texas**
**Trial Court Cause No. 429-51431-2018**

## MEMORANDUM OPINION

Before Justices Osborne, Pedersen, III, and Reichek
Opinion by Justice Pedersen, III

Appellant Jaqueline Glennis Garcia Sanchez (Wife) appeals the trial court's judgment in this divorce case. In four issues, she challenges the trial court's refusal to enforce the parties' Mediated Settlement Agreement and the court's characterization and division of certain property owned by her and appellee John Michael Wales (Husband) at the time of the divorce. We reverse the trial court's property division and remand for a new division of the parties' community estate. In all other respects we affirm the trial court's judgment.

## BACKGROUND

Wife and Husband were married in June of 2007. Wife came to Texas from her native Columbia when she married Husband. Among the property acquired during the marriage was certain real property located in that country, including an apartment where Wife's mother lives and a farm, which the parties refer to as the Finca. Husband is a pilot for American Airlines. He participated in two retirement plans with American Airlines both before and during the marriage. Before the marriage, Husband also owned a residence and winery known as Wales Manor in McKinney, Texas. Wife, Husband, and Wife's daughter lived at Wales Manor until they separated in 2018.

That same year Husband filed a petition seeking to annul the marriage, and Wife filed a counterpetition for divorce. The parties reached a mediated settlement agreement, but the trial court concluded—for reasons discussed below—that this mediated settlement agreement was null and void. The case was then tried to the court, resulting in a judgment that denied an annulment but granted the divorce. The trial court divided the community estate after characterizing disputed assets as separate or community property. Specific facts related to the property characterization and division are discussed in detail below.

After the trial court denied Wife's motion for new trial, she appealed.

## DISCUSSION

We address Wife's four appellate issues in turn.

# I. THE MEDIATED SETTLEMENT AGREEMENT

In her first issue, Wife argues the trial court erred by refusing to enforce the parties' Mediated Settlement Agreement (the MSA). She contends that the MSA meets the statutory requirements for such enforcement and that any violations of its terms were "incidental" to the parties' agreement overall.

The MSA provided in bold-faced capital letters that it was not subject to revocation, and it was signed by both parties and by their attorneys. Thus, as Wife asserts, the MSA did meet the requirements of the Family Code for a binding agreement. *See* TEX. FAM. CODE ANN. § 6.602(b). However, the terms of the parties' agreed property division—attached as Exhibit A to the MSA—included the following provisions in section A.1:

> (b) Wife will sign all paperwork necessary to release husband's farm and the Kia to husband, including, but not limited to, removing the ''familia'' clause from the farm and "liquidacion de sociedad conyugal de mutuo acuerdo," no later than July 31, 2019.

> (c) Wife will appear in Colombia to sign said paperwork, no later than July 31, 2019. Husband shall provide, through counsel, funds for wife's roundtrip airfare to Colombia not to exceed $1,000 total.

And, under the heading "**D. CONDITIONS PRECEDENT**," the MSA included this provision:

> Wife shall comply with provisions A.l(b), A.l(c) as conditions precedent to the entry of the final decree of divorce and QDRO. If she fails to comply with such provisions, this MSA shall be null and void in its entirety.

It is undisputed that Wife never appeared in Columbia to sign the required paperwork.[1] Nevertheless, she filed a motion to enforce the MSA; Husband opposed the motion. Following a hearing, the trial court denied the motion to enforce and found that "the Mediated Settlement Agreement is null and void in its entirety."

"A condition precedent is an event that must happen or be performed before a right can accrue to enforce an obligation." *Centex Corp. v. Dalton*, 840 S.W.2d 952, 956 (Tex. 1992). In this case, the parties' intent to condition enforceability of the MSA on Wife's appearance and execution of documents in Columbia is apparent on the face of the agreement.[2] Because Wife did not fulfill the condition, she had no right to enforce the obligations within the agreement.

We conclude that the trial court did not err in finding the MSA null and void, in accordance with its terms. We overrule Wife's first issue.

## II. DIVISION OF THE COMMUNITY ESTATE

A trial court's divorce decree must divide the parties' estate in a manner that is "just and right." FAM. § 7.001. We review the division of the community estate for an abuse of discretion. *Moroch v. Collins*, 174 S.W.3d 849, 857 (Tex. App.—Dallas 2005, pet. denied). In family law cases, the abuse-of-discretion standard of review

---

[1] The trip and paperwork were necessary because Wife had gone to Columbia after the separation and, without Husband's knowledge or approval, placed a type of lien on the Finca that prevented him from selling the property.

[2] We note that the MSA likewise imposed conditions based on Husband's performance of certain obligations. There is no argument here of unfair treatment of Wife in terms of application of the doctrine of condition precedent.

–4–

overlaps with the traditional sufficiency standards of review; as a result, legal and factual sufficiency are not independent grounds of reversible error, but instead constitute relevant factors as to whether the trial court abused its discretion. *In re A.B.P.*, 291 S.W.3d 91, 95 (Tex. App.—Dallas 2009, no pet.). Our analysis involves two questions: (1) did the trial court have sufficient evidence upon which to exercise its discretion, and (2) if so, did the court err in its exercise of that discretion? *Id.* We answer the first question employing traditional sufficiency standards; for the second, we determine whether, based on the elicited evidence, the trial court made a reasonable decision. *Moroch*, 174 S.W.3d at 857.

The community property presumption underlies all issues of property division in a divorce. "Community property consists of the property, other than separate property, acquired by either spouse during marriage." FAM. § 3.002. Separate property is property owned or claimed by a spouse before marriage or acquired by a spouse by gift, devise, or descent during the marriage. *Id.* § 3.001; *Prague v. Prague*, 190 S.W.3d 31, 38 (Tex. App.—Dallas 2005, pet. denied). Property possessed by either spouse on dissolution of the marriage is presumed to be community property. FAM. § 3.003(a). To overcome the community-property presumption, the spouse claiming certain property as separate must trace and clearly identify the property claimed to be separate. *Sink v. Sink*, 364 S.W.3d 340, 344 (Tex. App.—Dallas 2012, no pet.). "The burden of tracing is a difficult, but not impossible, burden to sustain." *Id.* at 344. It involves establishing the separate origin of the property through

"evidence showing the time and means by which the spouse originally obtained possession of the property." *Id*. To establish that property is separately owned, a party must offer clear and convincing evidence of that fact. FAM. § 3.003(b). Any doubt as to the character of property is resolved in favor of the community estate. *Sink*, 364 S.W.3d at 345.

Wife complains of three specific rulings by the trial court in its division of the community estate: (1) finding the Finca is Husband's separate property; (2) finding Husband's VOYA retirement account should be divided 80% separately to Husband and 20% to the community; and (3) refusing to consider Wife's claim for reimbursement.

### (A) The Finca

In her second issue, Wife argues the trial court erroneously characterized the Finca as Husband's separate property. The Finca was acquired during the marriage and thus is presumptively community property. FAM. §§ 3.002, 3.003(a). Wife contends that Husband did not rebut that presumption with clear and convincing evidence. Alternatively, she argues (1) that any separate funds used to purchase the property lost that character when they were commingled in the parties' joint bank account and (2) that Husband judicially admitted the Finca was community property in his Inventory and Appraisement.

Initially, Wife contends that no evidence supports characterization of the Finca as Husband's separate property other than his own "self-serving testimony,"

which is insufficient to rebut the community property presumption. She relies on *In re Marriage of Santopadre*, No. 05-07-00027-CV, 2008 WL 3844517 (Tex. App.—Dallas Aug. 19, 2008, no pet.), where we asserted: "A party claiming separate property must support the claim with documentary evidence; mere testimony that property is separate is generally insufficient to overcome the community presumption." *Id.* at *2. We explained that to rebut that presumption, a party is required to show "the time and means by which he originally obtained possession of each asset." *Id.* at *3. The husband in *Santopadre* offered no documentary evidence to establish when the assets at issue were acquired, and he testified only that "he owned each property or asset before his September 1996 marriage to [his wife]." *Id.* This unsupported and imprecise testimony was insufficient to establish the property as his separate property.

In this case, however, the trial court had more than imprecise assertions that the Finca was Husband's separate property or that Husband purchased the property with separate funds. The record establishes that the purchase price of the Finca was approximately $200,000. The record contains the following evidence:

- Testimony from Husband's mother that she gave certain funds to Husband. Her testimony is supported by the following documents:

  - A February 5, 2014 check for $50,000, which she gave him as part of an inheritance from his grandfather; and

- An August 25, 2015 check disbursement for $55,500, which she gave to Husband "for the Finca."

- The November 24, 2015 Texas Home Equity Note showing Husband received an extension of credit in the amount of $328,000 in connection with refinancing his mortgage on Wales Manor, which the parties stipulated was his separate property.

- Statements from a Chase checking account ending in 2961 and a Chase savings account ending in 8753 that show the following transactions:

  - On November 30, 2015, Freedom Title wired $106,673.95 into the checking account. Husband testified this amount was from the refinancing of Wales Manor.

  - On that same date, $200,000 was wired from the checking account to the savings account.

  - On December 1, 2, and 14, wire transfers, linked to Husband's passport number, were made from the saving account in the amounts of $180,000, $15,000, and $1600 respectively. Husband testified he paid for the Finca through these wire transfers.

- Columbian documents, which Husband testified were the Finca purchase documents, and which are acknowledged by a Texas notary on December 16, 2015.

Thus, testimony and documentation—showing when and from what source Husband obtained the money used to purchase the Finca—supported his testimony that the Finca was his separate property. *See Santopadre*, 2008 WL 3844517 at \*3. Moreover, the record contains no evidence suggesting that the funds at issue were actually derived from some other source.

We conclude the trial court had sufficient evidence to characterize the Finca as it did. *See A.B.P.*, 291 S.W.3d at 95. And we conclude that, based on the evidence before the trial court, the court's characterization was reasonable. *See Moroch*, 174 S.W.3d at 857; *see also LaFrensen v. LaFrensen*, 106 S.W.3d 876, 877 (Tex. App.—Dallas 2003, no pet.). ("A trial court does not abuse its discretion if there is some evidence of a substantive and probative character to support the decision."). Husband presented uncontroverted, clear and convincing evidence that the funds used to purchase the Finca were his separate assets. *See Pace v. Pace*, 160 S.W.3d 706, 712 (Tex. App.—Dallas 2005, pet. denied) (clear and convincing evidence of funds used to purchase real property was sufficient to rebut community property presumption and support trial court's finding that real property was spouse's separate property). Thus, he offered sufficient evidence to rebut the community property presumption. *See* FAM. § 3.03(b).

Wife argues that even if the funds used to purchase the Finca were initially Husband's separate funds, they lost that character when they were commingled with community funds in the parties' shared account. But the fact that community

–9–

and separate funds were deposited in the same account does not conclusively establish that the entire amount is community when the separate funds may be traced. *Holloway v. Holloway*, 671 S.W.2d 51, 60 (Tex. App.—Dallas 1983, writ dism'd). In this context, "[t]racing involves establishing the separate origin of the property through evidence proving the time and means by which the spouse originally obtained possession of the property." *Moroch,* 174 S.W.3d at 856–57. We have determined above that the funds Husband testified he used to purchase the Finca—the checks from his mother and funds from refinancing Wales Manor—were in fact his separate funds. Bank statements in the record allow us easily to follow these large deposits and withdrawals through the accounts. Indeed, neither account contains a balance sufficient to withdraw the purchase funds until after the November refinancing wire transfer was deposited.[3] Because we can determine when and how Husband obtained the funds used for the purchase of the Finca, we conclude they were not commingled to an extent that they lost their separate-property nature. *See id.*

And finally, we reject Wife's argument that Husband's Inventory and Appraisement (the I&A) represented a judicial admission that the Finca was community property. A pleaded statement may be a judicial admission of a fact if it

---

[3] The only other sizable deposits during this entire time frame are identified by the bank as salary payments and a tax refund. And these deposits are not comparable in size to the ones Husband made from his separate funds.

is clear, deliberate, and unequivocal. *Horizon/CMS Healthcare Corp. v. Auld*, 34 S.W.3d 887, 905 (Tex. 2000). But the I&A did not classify the Finca as community property in any fashion. Husband listed the property only under the heading "Real Property," which does not speak to any estate characterization. Furthermore, Husband specifically disclaimed the characterization of any property listed in the I&A as community property by appending this footnote to the title of the document:

> [Husband] contends that no community estate was created and is requesting an annulment of the marriage at issue. Any reference to assets, liabilities, community property, community estate, or community liabilities is subject to Petitioner's request for annulment and is not a judicial admission of the existence of same. Petitioner's reference to assets, liabilities, community property, community estate and/or community liabilities [are] based upon his alternate requests for relief.

We conclude that the I&A contains no judicial admission by Husband that the Finca is community property.

The trial court did not abuse its discretion by characterizing the Finca as Husband's separate property. We overrule Wife's second issue.

### (B) The VOYA IRA

In her third issue, Wife contends that the trial court erred in characterizing the VOYA IRA as 80% Husband's separate property and 20% community property. We agree.

Certain facts about the origins of the VOYA IRA are not disputed. American Airlines sponsored a defined contribution retirement plan for its pilots that was

known as the "B Plan."[4] The company contributed 11% of a pilot's salary each year; employees made no contributions. The B Plan was an investment trust, in which members held "units" that represented a fractional ownership in all of the trust's holdings. The plan paid annuities to retired pilots, and to that end, the structure of the plan required a participant's unit holdings to be increased at the end of each year by 6%. This increase was in the number of units representing the member's holdings, *not* in the value of the member's holdings. The requirement of a 6% increase in unit holdings each year was documented at trial by Husband's exhibit 21, which is a single page extracted from American Airlines' summary of the retirement plan.

In 1990, when Husband had been employed for one year, American Airlines began making contributions to his B Plan. Husband owned 3,615.12 units at the time he and Wife were married in 2007. This number—together with the number of units credited to Husband each year of the plan—is documented in Husband's exhibit 10, which was identified as the American Airlines' Divorce Kit, produced by the company at Husband's request. Neither the Divorce Kit nor any other document or testimony evidences the monetary value of those 3,615.12 units at the time of the marriage.

American Airlines continued contributing to the B Plan through October 2012. At that time—in connection with the airline's bankruptcy—the B Plan was

---

[4] The company also sponsored an "A Plan"; the parties agreed at trial concerning the division of the funds from that plan. The B Plan was also referred to as the "Pilot Variable" plan.

frozen, and the funds credited to Husband were rolled over into the VOYA IRA. The Divorce Kit establishes that Husband's plan included 6,055.436 units at that time. No evidence purports to identify the monetary value of those units. In addition, no evidence identifies the portion of the monetary amount rolled over in 2012 that represented the earnings of any units between 2007 and the rollover.

The only documentary evidence of the VOYA IRA in our record is a single monthly statement from November 2019. At the end of that month the IRA was valued at $680,947.69.[5] And at that time, the assets within the IRA were apportioned between Cash, Money Funds, and Bank Deposits (2%), Equities (30%), Mutual Funds (23%), and Exchange-Traded Products (45%). The November statement provides no historical information concerning the original purchase of assets in the IRA following the rollover. Nor do we know how the value of the IRA changed from its inception in 2012 until the date of divorce in 2020.

Husband argues that the trial court's characterization of 80% of the VOYA IRA as his separate property is correct. His trial expert, Marcus Bras, testified that—as a certified financial planner and a former American Airlines pilot—he had worked on more than 200 valuations of American Airlines retirement plans in cases of pilot divorce. Bras opined that determining the monetary value of the B Plan units,

---

[5] The parties and the trial court employ different numbers for this value of the IRA. The specific value of the IRA on the date of divorce is not evidenced in the record. For purposes of this opinion, we will use the number in exhibit 8, the November 2019 statement.

whether at the time of marriage or rollover, was not necessary to identification of VOYA funds as separate or community property or to their proper division. Instead, Bras asserted that "[t]he separate property is not the determination of a valuation, but the determination of a ratio of units."

To determine this ratio, he engaged in a two-part analysis of the estates' shares in the B Plan. First, he took the number of units owned by Husband at the time of marriage—assuming that those 3,615.12 units were Husband's separate property—and calculated a 6% increase in that number each year from the 2007 marriage until the 2012 rollover. He concluded that Husband's separate units would have increased to approximately 4,837 units in 2012 by virtue of the annual 6% increase. Second, he subtracted those 4,837 units, which he now identified as Husband's separate property, from the total of 6,055 units in 2012. This calculation left approximately 1,218 units that were contributed by American Airlines during the post-marriage pre-rollover time period. Bras identified these units as community property. Based on his calculations, Bras characterized the ratio between units owned by the estates as 80-20, or 80% separate property and 20% community property. He applied those percentages to the value of the VOYA IRA at the time of the divorce, contending that 80% of the VOYA was Husband's separate property and 20% belonged to the community. Thus, he testified, Wife was entitled to 10% of the value of the VOYA.

Wife's expert, Douglas Fejer, is a certified public accountant who testified he has traced and identified property belonging to separate and community estates in

many cases. At trial, Fejer completely rejected Bras's analysis. At the outset, he confirmed that there had been no valuation of the B Plan at the time of the marriage. He testified that such a valuation was the only relevant testimony experts could give in this type of plan to determine the separate property owned at that time.

As to Bras's efforts to characterize the ownership ratio of the B Plan, Fejer stressed that the property that needed to be characterized and divided was the VOYA account. He disagreed with Bras that—at the time of the rollover—Husband's separate-property share of the funds was 80% and the community's share of the funds was just 20%. However, he testified that even if we accepted that ratio as to ownership of the B Plan, using the same ratio to value the VOYA in 2020 would be "absurd." Bras's ratio did not take into account the amounts earned between 2012 and 2020 by both separate and community "shares" through interest, dividends, and capital gains, all of which is community property under Texas law. Fejer concluded that no legitimate evidence proved what Husband's separate property interest was in the VOYA account. Accordingly, he opined that the community property presumption should apply to the entire account.

The trial court adopted Bras's 80-20 ratio to divide the VOYA account funds. It found that 80% of the account, which it calculated as $428,145.74, was Husband's separate property. It found that 20% of the account, which it calculated as $200,000, was community property. Thus, each party was awarded $100,000 from the VOYA funds as community property. In this Court, Wife challenges the trial court's

"characterization of [the] American Airlines B Plan/IRA" as 80% separate property and 20% community property.

It is undisputed that American Airlines contributed to the B Plan for years before Husband and Wife were married. Ordinarily, then, Husband would be entitled to the value of the B Plan on the date of marriage as his separate property. *See* FAM. § 3.001(1) (spouse's separate property includes property owned or claimed before marriage). But if there is no evidence of the account's value at the time of marriage, then there is no evidence to overcome the community property presumption. *Id.* § 3.003. In this case, the only evidence concerning the value of the B Plan at the time of the marriage is a number of "units" representing Husband's share of the plan's investment trust. No evidence identifies the monetary value either of one such unit or of the trust as a whole.[6] Indeed, Bras testified that such evidence would be "of no significance." We disagree. Absent some evidence of the value of his share of the B Plan at the time of marriage, there is no way to identify a portion of the VOYA account that qualifies as separate property owned before marriage. Husband has

---

[6] Nor is there evidence that valuing the units or the trust as a whole would have been impossible. To the contrary, the one-page exhibit 21, offered by Husband to support the 6% increase in number of units each year, also states: "The Year-end, Audited Unit Value is determined as of December 31 each year and is available as of March 31 of the following year. It is calculated according to the following formula:

The total market value of the trust fund as of December 31

Divided by

The total number of Units in the trust fund as of December 31."

failed to overcome the community property presumption concerning that portion of the account.

The failure to value units within the B Plan is compounded by the pro rata analysis provided by Husband's expert. As we have discussed, that analysis began with the number of units owned at the date of marriage (approximately 3,615) and then increased that number of units by 6% for each year of the marriage. This expanded number of units (4,837)—purportedly representing Husband's share of the plan—was subtracted from the total number of units in the plan when it was frozen (6,055), leaving a number of units purportedly added and similarly expanded annually by 6% during the marriage (1,218), which Bras opined were the community's share of the B Plan at rollover. Bras compared the shares he had allocated to the two estates and concluded that: (1) the numbers yielded a B Plan ownership ratio of the Husband's separate property (80%) to the community's property (20%); and (2) the VOYA IRA should be characterized and divided by that same ratio. The trial court's findings indicate that she adopted this reasoning.

We discern at least two problems with Bras's pro rata analysis. First, by attributing all of the growth in Husband's original units to him, Bras ignores the earnings those units generated between the date of the marriage and the date the plan was frozen. Any benefits in a defined contribution pension plan that accrue during the marriage are community property subject to division on divorce. *Dewey v. Dewey*, 745 S.W.2d 514, 519 (Tex. App.—Corpus Christi 1988, writ denied); *see*

*also McClary v. Thompson*, 65 S.W.3d 829, 836 (Tex. App.—Fort Worth 2002, pet. denied) (contributions and interest earned in retirement account during marriage are community property). Thus, Bras's ratio does not take into account the portion of Husband's allocation that represents interest, dividends, or other earnings of those units, which belong rightfully to the community. The record contains no clear and convincing evidence to establish that Husband's separate property share of the B Plan at the time of the rollover was 80%.

But even if Bras's ownership ratio at the time of the rollover had been correct, the complete dearth of historical information concerning the VOYA would undermine his ultimate conclusion. The record contains no information concerning the monetary value of the VOYA at inception. No evidence describes the original assets of the VOYA or how they were purchased, i.e, with separate-property funds or community-property funds. No evidence allowed tracing of the assets that comprised the VOYA at the time of the divorce. And no evidence indicates how much of the ultimate value of the account represented interest, dividends, or other earnings. All of those earnings belonged to the community estate at the time of the divorce. Bras's conclusion that 80% of the value of the IRA represents Husband's separate property is not supported by legally viable evidence.

Husband acknowledges there is no evidence in the record of interest or dividends generated in the retirement accounts after the date of marriage. But he relies on this fact to argue that we cannot determine whether any mischaracterization

of the funds affected the just and right division of the community estate. He contends that we cannot determine whether any error caused more than a de minimis effect. *See, e.g., Roberts v. Roberts*, 402 S.W.3d 833, 839 (Tex. App.—San Antonio 2013, no pet.) (trial court's mischaracterization of property upon dissolution of marriage is not automatic ground for reversal; reversal not warranted if error causes only de minimis effect). But it was Husband's burden at trial to overcome the community property presumption by tracing the funds in the VOYA IRA back to property he owned before marriage. This burden included accounting for any earnings generated by his original account. By failing to make such an accounting, Husband has failed to overcome the community property presumption.[7]

We conclude that no reasonable fact finder could have formed a firm belief or conviction (a) that an unvalued portion of the B Plan funds was Husband's separate property at the time of marriage, (b) that 80% of the B Plan funds were Husband's separate property at the time the account was frozen; or (c) that 80% of the VOYA IRA funds were his separate property at the time of the divorce. The trial court did not have sufficient evidence to make these findings. *See A.B.P.*, 291 S.W.3d at 95. We conclude the trial court abused its discretion by characterizing and dividing the VOYA IRA according to an 80-20 ownership ratio when no legally sufficient

___

[7] We note by way of illustration that the only documentary record of the VOYA IRA, the November 2019 statement of the account, reports an increase in the value of the account during that single month of approximately $26,000. We cannot assume such earnings consistently, of course, but we also cannot assume the earnings over a period of thirteen years would be de minimis.

evidence supported that division. We conclude further that the trial court's abuse of discretion affected the just and right division of the community estate.

We sustain Wife's third issue.

### (C) Reimbursement

In her fourth issue, Wife argues that the trial court erroneously failed to reimburse the community estate for Husband's use of community funds to pay the mortgage on his separate property, known as Wales Manor. She points to Husband's testimony that, after refinancing that property, he made the home equity loan payments from his American Airlines salary. Documents related to the home equity loan indicate that the monthly payment on the note was $1711, beginning in November 2015, and continuing through the divorce. Wife argues the community estate is due reimbursement for those payments. Husband argues that this claim is not supported by the pleadings or the evidence. The trial court found that Wife had presented "no testimony or evidence" supporting her reimbursement claim.

Our review of the pleadings indicates that Wife made a reimbursement claim in her petition, seeking recovery for the community estate on two bases. First, she pleaded that "[t]he community estate has expended funds or assets to make capital improvements on property claimed by [Husband] as separate property." Wife makes no argument on appeal and cites no evidence supporting the existence of such capital improvements.

–20–

Wife also pleaded for reimbursement based upon Husband's "obligat[ion] on a debt incurred during the marriage for the acquisition of . . . property and secured by a lien on property claimed by [Husband] as separate property. The community estate has expended funds or assets for payment of that debt." Thus, Wife's claim for the community's having paid on the home equity loan is supported by a pleading.

Likewise, her claim on behalf of the community is supported by some evidence. Husband's home equity note was admitted at trial. It is dated November 24, 2015, and it includes a promise to make the monthly payment of $1711 on the first day of each month beginning January 1, 2016. Husband testified that he had been making those payments every month from his American Airlines salary.[8] "The payment by one marital estate of the debt of another creates a prima facie right of reimbursement." *Penick v. Penick,* 783 S.W.2d 194, 196 (Tex.1988); *see also Knight v. Knight*, 301 S.W.3d 723, 731 (Tex. App.—Houston [14th Dist.] 2009, no pet.) (community estate entitled to reimbursement when husband's separate property judgment was paid by community property funds); *Marshall v. Marshall*, 735 S.W.2d 587, 595 (Tex. App.—Dallas 1987, writ ref'd n.r.e.) (community estate due reimbursement reimbursed for amount husband's partnership income was used during marriage to pay his "separate debt" for taxes).

---

[8] Wife appears to contend that the community is also due reimbursement for payments on the original mortgage for Wales Manor from the date of the marriage through Husband's refinancing. However, the record contains no evidence concerning such payments.

–21–

Wife argues that the community estate should be reimbursed more than $82,000 for payments made between November 2015 and the parties' divorce in 2020. However, reimbursement is an equitable claim, and therefore "is not merely a balancing of the ledgers between the marital estates." *Penick*, 783 S.W.2d at 198. The trial court has broad discretion to consider any offsetting factors when valuing the reimbursement claim. *Id.* Indeed, the Texas Family Code instructs that the trial court "shall resolve a claim for reimbursement by using equitable principles, including the principle that claims for reimbursement may be offset against each other if the court determines it to be appropriate." FAM. § 3.402(b). This Court may not usurp the trial court's discretion to make an equitable assessment of the value of the reimbursement claim.

Nevertheless, we conclude that the trial court abused its discretion in refusing to consider Wife's claim for reimbursement given the evidence in the record. Evaluation of that claim should have been part of the just and right division of the community estate. We sustain Wife's fourth issue.

## CONCLUSION

We conclude that the trial court erred in its efforts to make a just and right division of the community estate. Accordingly, we must remand the entire community estate for a new division. *Jacobs v. Jacobs*, 687 S.W.2d 731, 733 (Tex. 1985). We reverse the portion of the trial court's judgment that divides the community estate; in all other respects, the judgment of the trial court is affirmed.

/Bill Pedersen, III//

200485f.p05

BILL PEDERSEN, III
JUSTICE



# Court of Appeals
# Fifth District of Texas at Dallas

## JUDGMENT

JAQUELINE GLENNIS GARCIA
SANCHEZ, Appellant

No. 05-20-00485-CV     V.

JOHN MICHAEL WALES, Appellee

On Appeal from the 429th Judicial
District Court, Collin County, Texas
Trial Court Cause No. 429-51431-
2018.
Opinion delivered by Justice
Pedersen, III. Justices Osborne and
Reichek participating.

In accordance with this Court's opinion of this date, the judgment of the trial court is **AFFIRMED** in part and **REVERSED** in part. We **REVERSE** that portion of the trial court's judgment that divides the community estate. In all other respects, the trial court's judgment is **AFFIRMED**. We **REMAND** the community estate to the trial court for a new division consistent with this opinion.

It is **ORDERED** that appellant Jaqueline Glennis Garcia Sanchez recover her costs of this appeal from appellee John Michael Wales.

Judgment entered this 8th day of April, 2022.