**Opinion filed January 23, 2020**



## In The

# Eleventh Court of Appeals

_____

## No. 11-14-00206-CV
_____

## GREAT WESTERN DRILLING, LTD., Appellant

## V.

## PATHFINDER OIL & GAS, INC. AND
## CATHLIND ENERGY, LLC, Appellees

### On Appeal from the 142nd District Court
### Midland County, Texas
### Trial Court Cause No. CV-45,031

## MEMORANDUM OPINION ON REMAND

This suit arises from Pathfinder Oil & Gas, Inc.'s claim that Great Western Drilling, Ltd. breached an agreement to convey a 25% working interest in certain mineral leases to Pathfinder.[1] Great Western disputed that there was an agreement.

---

[1]AP Oil & Gas Co., rather than Pathfinder, is the party to the disputed agreement. AP Oil & Gas merged into Pathfinder and no longer exists. In December 2008, Great Western acquired all the assets of Pathfinder except for the claims in this lawsuit. Cathlind Energy, LLC is the assignee of those claims. In this opinion, we will refer to AP Oil & Gas, Pathfinder, and Cathlind, collectively, as "Pathfinder."

The jury found in favor of Pathfinder, and pursuant to the parties' stipulations, the trial court signed a judgment in which it (1) ordered that Pathfinder was entitled to specific performance of the agreement as well as an accounting; (2) ordered Great Western to assign to Pathfinder a 25% interest in the leases and to deliver to Pathfinder $3,053,023.40, which represented 25% of the net revenue from the leases through December 2013; and (3) awarded Pathfinder prejudgment interest in the amount of $729,252.90, as well as attorneys' fees.

On original submission, we addressed only Great Western's second issue, in which it complained that the trial court erred when it failed to submit a question to the jury on whether Pathfinder was ready, willing, and able to perform the agreement. *See Great W. Drilling, Ltd. v. Pathfinder Oil & Gas, Inc.*, 568 S.W.3d 148, 152, 156 (Tex. App.—Eastland 2017), *rev'd*, 574 S.W.3d 882 (Tex. 2019). We reversed the trial court's judgment and rendered judgment in favor of Great Western. *See id.* The Texas Supreme Court subsequently determined that, pursuant to the parties' stipulations, Great Western waived the right to a fact finding on whether Pathfinder was ready, willing, and able to perform the agreement. *Pathfinder Oil & Gas, Inc. v. Great W. Drilling, Ltd.*, 574 S.W.3d 882, 893 (Tex. 2019). The court reversed our judgment and remanded the case back to us to consider the issues raised by Great Western that we did not reach in our first opinion.

In its two remaining issues, Great Western asserts that the trial court erred when it did not grant Great Western's motion for judgment notwithstanding the verdict (JNOV). Great Western also asserts that the trial court erred by awarding monetary relief and prejudgment interest to Pathfinder. We hold that the trial court did not err when it failed to grant Great Western's motion for JNOV because the evidence is legally sufficient to support the jury's finding that Great Western agreed to convey a 25% interest in the leases to Pathfinder. We also hold that, pursuant to

the parties' stipulations, Pathfinder was entitled to specific performance of the agreement, which included the payment of 25% of the historical net revenue from the leases, and that the evidence was sufficient to support the trial court's award of prejudgment interest. Further, because the parties stipulated that Great Western would provide Pathfinder with an accounting of revenue and out-of-pocket expenses, the trial court did not err when it ordered Great Western to provide the agreed-upon accounting. We affirm the trial court's judgment.

*Background*

Beginning in the mid-1990s, Pathfinder, with the assistance of Llewellyn Culbert, a geologist, developed and promoted prospects for the exploration of oil in the Permian Basin. Great Western was also actively involved in drilling wells in the area. In 2003, Pathfinder assigned 40% of the working interest in certain mineral leases in the Latigo Prospect to Great Western, and Great Western agreed to drill three wells on those leases. Great Western, as the operator, and Pathfinder and other parties who owned working interests in the leases signed two joint operating agreements—one for the Strawn Formation and one for the Lower Clear Fork Formation. Each joint operating agreement defined an area of mutual interest (AMI) in which, for a period of three years, the parties had a right to participate in any acquisition of mineral interests.

Of the three wells drilled by Great Western in the Latigo Prospect, only one was marginally productive. The Airfield Number 1 was dry in the Strawn Formation, but produced a small amount of oil in the Lower Clear Fork Formation. Based on the mud logs and tests from the drilling of the Airfield Number 1, as well as 3-D seismic data, both Great Western and Pathfinder believed that the porosity of the formation "downdip" from the Airfield Number 1 would allow for a greater production of oil.

Great Western decided to acquire mineral leases on property in an area designated as Labors 1 and 10 that was adjacent to, but outside, the AMI for the Lower Clear Fork Formation. Great Western asked Steve Buckley, a landman with extensive experience in the Latigo Prospect, to acquire the leases. Buckley had a long relationship with Pathfinder, and Great Western assured him that Pathfinder would have an opportunity to participate in the new leases. Buckley obtained Pathfinder's consent to do the work and acquired leases in Labors 1 and 10 for Great Western.

In late May 2004, Great Western began to drill the Airfield Number 2 at a location that was within the AMI, but 476 feet from the boundary of Labors 1 and 10. On June 1, 2004, Great Western faxed a letter to Pathfinder in which it offered Pathfinder the opportunity to acquire 25% of the mineral leases obtained on 275.8 gross acres in Labors 1 and 10. Great Western specifically noted that it had not offered any other participant in the Latigo Prospect joint operating agreements an opportunity to acquire an interest in the Labors 1 and 10 leases. Great Western also indicated that the offered interest was "inclusive of any interests which [Pathfinder] may be obligated to convey to third parties, namely the Estate of WD Kennedy, Mary B. Kennedy and Ninety Six Corporation." The Estate of W.D. Kennedy, Mary B. Kennedy, and the Ninety Six Corporation (collectively the Kennedy Group) each owned a working interest in leases within the AMI of the Latigo Prospect Lower Clear Fork joint operating agreement. Pathfinder, which was owned by Ted Ashford and Sam Peppiatt, had a long-standing relationship with W.D. Kennedy. Mary B. Kennedy was W.D. Kennedy's widow, and the Ninety Six Corporation was owned by W.D. and Mary's son, Duncan Kennedy.

Great Western instructed Pathfinder to "indicate [its] election on participating in this purchase by checking the appropriate blank below, signing, dating and

4

returning a copy of this letter to Great Western within forty-eight (48) hours of [Pathfinder's] receipt of this letter insofar as the Airport [sic] No. 2 well is drilling on an offset tract." Great Western stated that, if Pathfinder elects to acquire the 25% interest in the Labors 1 and 10 leases, Great Western "will" require that Pathfinder "obtain [Great Western's] written consent prior to assignment of any interest to a third party other than" the Kennedy Group, "will" bill Pathfinder for 25% of the costs that Great Western incurred to acquire the leases, and "will work on the details of a participation agreement for this acreage as soon as reasonably possible."

Peppiatt, as Pathfinder's executive vice president, checked the blank on the letter that stated that Pathfinder "hereby elects to participate in acquiring its share of the lease offered above" and signed the June 1, 2004 letter. Pathfinder returned the election to Great Western by facsimile at 3:16 p.m. on June 2, 2004.

After the June 1, 2004 letter was signed, Ashford requested an additional 3% interest in the mineral leases on Labors 1 and 10. According to Peppiatt, the 25% interest was a "done deal," and Pathfinder wanted the additional 3% interest in order to "take care of the other parties" to whom Pathfinder, as the promoter of the Latigo Prospect, felt that it had an obligation. Ashford testified that he intended to assign a 4% working interest along with an override to Culbert.[2] Ashford did not intend to assign any of Pathfinder's 25% interest to the Kennedy Group. Instead, Ashford offered the Kennedy Group the opportunity to participate in the Wolf Creek prospect that was located approximately three miles from Labors 1 and 10. Both Peppiatt and Duncan Kennedy testified that Pathfinder did not have an obligation to include the Kennedy Group in the leases on Labors 1 and 10.

---

[2]By the time of trial, Ashford had been diagnosed with Alzheimer's disease and was unable to testify. The parties offered excerpts from a September 13, 2005 deposition taken in an arbitration that was filed by other participants in the Latigo Prospect who were not offered the opportunity to participate in the leases on Labors 1 and 10.

The Airfield Number 2 was completed in the "middle" of June 2004. Carter Muire, who has been Great Western's land manager since 2008, described the Airfield Number 2 as a "good" well that produced more than 100 barrels of oil per day.

On September 20, 2004, Great Western sent Pathfinder a letter that transmitted a proposed joint operating agreement for the leases on Labors 1 and 10 (the JOA) and indicated that Pathfinder's share of the lease acquisition costs was $9,968.98. The attached JOA stated that Great Western owned a 75% interest in the leases on Labors 1 and 10, that Pathfinder owned a 25% interest in those leases, and that Culbert had an overriding royalty that would "be borne exclusively by Pathfinder." The JOA provided that, if any party desired to sell all or any part of its interests under the JOA, the other parties had a preferential right to purchase those interests. Paragraph M of the JOA also placed restrictions on Pathfinder's rights to assign any interest in the leases on Labors 1 and 10 and on the price that it could receive under certain conditions.

Pathfinder did not agree with the inclusion of Paragraph M in the JOA. Through the rest of September and into October, Ashford had discussions with Muire and Mike Heathington, who at that time was Great Western's land manager, about Paragraph M of the JOA and about whether Pathfinder could acquire an additional 3% interest in the leases on Labors 1 and 10.

In an October 11, 2004 letter, Heathington indicated to Ashford that, although Pathfinder had not identified the parties to which Pathfinder intended to convey any interest in the leases, Great Western would exclude any interest that Pathfinder conveyed to the Kennedy Group or to Culbert from Great Western's right of first refusal under the JOA. On the fax cover sheet to the letter, Heathington noted that

he was "still checking with our people on any additional interests that could be offered (3%)."

On October 28, 2004, Ashford, Muire, and Heathington had a lengthy telephone conversation about Pathfinder's request for an additional 3% interest and the language in Paragraph M of the JOA. According to Heathington and Muire, during the conversation Heathington told Ashford that the June 1, 2004 offer was withdrawn. Ashford did not recall that statement, but he indicated that, at the time of his deposition, the entire conversation was "vague."

At 9:31 a.m. on October 29, 2004, Muire sent a letter to Pathfinder by fax that stated that Great Western's offer to allow Pathfinder to purchase a 25% interest in the leases on Labors 1 and 10 was contingent upon Pathfinder's payment of 25% of the lease acquisition costs and the execution of a participation agreement in the form of the JOA. Muire stated that, because Pathfinder had not paid its share of the lease acquisition costs and had not signed either the JOA or Great Western's cost estimate for drilling the first well on Labor 1, Great Western was withdrawing the offer. That same day, between 10:00 a.m. and 11:00 a.m., Ashford mailed signed copies of the JOA and of the cost estimate and a check for $9,968.98 to Great Western.

In January or February 2005, Great Western completed the CH Foundation 10-1 on Labor 1. The CH Foundation 10-1 was a "flowing" well that did not need a pump jack to produce oil. On March 21, 2005, Pathfinder sent a letter to Great Western that stated that Pathfinder claimed an undivided 25% interest in the oil and gas leases in Labors 1 and 10. Great Western filed this suit on April 1, 2005, against Pathfinder and Culbert and requested that the trial court declare the relative rights, duties, and obligations of the parties in connection with Labors 1 and 10 and

7

determine ownership of the 25% working interest claimed by both Great Western and by Pathfinder and Culbert.[3]

Pathfinder answered and filed counterclaims for specific performance, breach of contract, fraud, and fraudulent inducement. Pathfinder also sought a declaration that a valid contract existed between it and Great Western and that it was entitled to acquire an undivided leasehold interest in Labors 1 and 10 as well as in an area designated as Labor 11.

The day before trial (December 2, 2013), the parties signed stipulations that expressly limited the issues to be submitted to the jury to the following matters: (a) whether the June 1, 2004 agreement was an enforceable agreement, (b) whether Great Western or Pathfinder breached the agreement, and (c) whether Great Western established its affirmative defenses. The parties further stipulated that Pathfinder's remedy would be limited to specific performance, and they specified the conditions for Pathfinder to obtain that remedy. Pathfinder also waived its claim for money damages on its breach of contract claim. Finally, Pathfinder was required to nonsuit its claims related to Labor 11 and its request for an accounting.

At the close of evidence, the trial court instructed the jury in accordance with the written stipulations and submitted five questions about contract formation, breach, and affirmative defenses. In response to the first three questions, the jury found that the June 1, 2004 letter was an agreement between Great Western and Pathfinder, that Pathfinder did not fail to comply with the June 1, 2004 letter, and that Great Western did fail to comply with the June 1, 2004 letter. Based on the conditioning language in the charge, the jury did not answer the remaining questions.

Pathfinder moved for an award of attorneys' fees and for entry of judgment. Prior to the hearing on Pathfinder's motions, Great Western forwarded to

---

[3]Great Western subsequently dismissed its claims against Culbert.

Pathfinder's counsel a spreadsheet that set out the revenue and expenses from the wells on Labors 1 and 10 since September 2004. The spreadsheet showed that Pathfinder's 25% share of the historical net revenue from the leases was $3,053,023.40, and that prejudgment interest on that amount was $729,252.90.

The trial court signed a final judgment in which it ordered that Pathfinder was entitled to specific performance of the June 1, 2004 agreement and that "none of the amounts of money awarded herein as net revenue, interest or attorney fees are to be deemed monetary damages, but are the result of the specific performance by the parties or reasonable and necessary attorney fees allowed by statute." The trial court ordered Great Western to convey to Pathfinder, effective November 1, 2004, an undivided 25% interest in the mineral leases on Labors 1 and 10. The judgment further required Great Western to provide an accounting of all revenue received by Great Western from the production of hydrocarbons from the wells on Labors 1 and 10, the actual out-of-pocket expenses that Great Western had incurred in connection with its acquisition of leases and drilling and operating wells on Labors 1 and 10, and the out-of-pocket expenses charged to Pathfinder's 25% interest. In the final judgment, the trial court ordered Great Western to deliver to Pathfinder net proceeds that represented Pathfinder's 25% interest in the wells in Labors 1 and 10 in the amount of $3,053,023.40 and to deliver to Pathfinder prejudgment interest in the amount of $729,252.90. The trial court also ordered Pathfinder to execute the JOA, and it awarded Pathfinder attorneys' fees. Finally, the trial court ordered that Pathfinder's claims related to Labor 11 were deemed nonsuited and that Pathfinder's request for an accounting was dismissed.

Great Western filed a motion for new trial and a motion for JNOV. As relevant to this appeal, Great Western argued in the motion for JNOV (1) that there was legally insufficient evidence to support the jury's answers to Question Nos. 1,

2, and 3 and (2) that the June 1, 2004 letter was not an enforceable agreement as a matter of law because it lacked essential terms and was not accepted according to its terms before the offer was withdrawn.

*Analysis*

In its first and third issues, Great Western contends that the trial court erred (1) when it failed to grant Great Western's motion for JNOV because Great Western revoked its offer before the conditions precedent to the June 1, 2004 agreement were satisfied and (2) when it awarded monetary relief to Pathfinder because the parties, by stipulation, withdrew the determination of any sums due from the case and because no competent evidence supports the award. Both of these issues require us to construe a contract. *See Pathfinder Oil & Gas*, 574 S.W.3d at 888 (recognizing that the stipulations of the parties are construed under the same rules as a contract); *Progressive Cty. Mut. Ins. Co. v. Trevino*, 202 S.W.3d 811, 814 (Tex. App.—San Antonio 2006, pet. denied) (noting that determination of whether language in an agreement constitutes a condition precedent is a matter of contract interpretation).

When we construe a contract, we must look to the language of the parties' agreement. *Barrow-Shaver Res. Co. v. Carrizo Oil & Gas, Inc.*, No. 17-0332, 2019 WL 2668317, at *4 (Tex. June 28, 2019). Our primary objective "is to give effect to the written expression of the parties' intent." *Pathfinder Oil & Gas*, 574 S.W.3d at 888. "Objective manifestations of intent control, not 'what one side or the other alleges they intended to say but did not.'" *URI, Inc. v. Kleberg Cty.*, 543 S.W.3d 755, 763–64 (Tex. 2018) (footnote omitted) (quoting *Gilbert Tex. Constr., L.P. v. Underwriters at Lloyd's London*, 327 S.W.3d 118, 127 (Tex. 2010)). We, therefore, "presume parties intend what the words of their contract say" and interpret the language of a contract according to its "plain, ordinary, and generally accepted meaning" unless the contract directs otherwise. *Id.* at 764 (first quoting *Gilbert Tex.*

*Constr.*, 327 S.W.3d at 126; then quoting *Heritage Res., Inc. v. NationsBank*, 939 S.W.2d 118, 121 (Tex. 1996)).

Because "[c]ontext is important," we consider the entire writing in an effort to harmonize and give effect to all of the provisions of the contract so that none are rendered meaningless. *Exxon Mobil Corp. v. Ins. Co. of State*, 568 S.W.3d 650, 657 (Tex. 2019). No one phrase, sentence, or section of the agreement should be isolated from its setting and considered apart from the other contractual provisions. *Pathfinder Oil & Gas*, 574 S.W.3d at 889.

We may also consider the objectively determinable facts and circumstances surrounding a contract's execution to aid in our interpretation of the contract's language. *URI*, 543 S.W.3d at 757–58, 764. But, the surrounding facts and circumstances cannot be used to "augment, alter, or contradict the terms of an unambiguous contract." *Id.* at 758. We may neither rewrite the parties' contract nor add to or subtract from the contract's language. *Id.* at 770 (citing *Fischer v. CTMI, L.L.C.*, 479 S.W.3d 231, 242 (Tex. 2016)).

*A. The June 1, 2004 Letter*

In its first issue, Great Western contends that the trial court erred when it failed to grant Great Western's motion for JNOV. Great Western specifically argues (1) that the jury's answer to Question No. 1, which inquired as to the existence of an agreement between Great Western and Pathfinder, should have been disregarded because, as a matter of law, the purported agreement had conditions precedent to contract formation that were not fully accepted by October 29, 2004, when Great Western withdrew the offer; (2) that Great Western's withdrawal of its offer was timely and effective as a matter of law; (3) that the jury's answers to Question Nos. 2 and 3, which inquired as to whether Pathfinder or Great Western failed to comply with the agreement, should have been disregarded as immaterial because Great

11

Western's offer was not fully accepted before it was withdrawn and there was thus no contract to breach or comply with; and (4) that there was legally insufficient evidence to support the jury's answers to Question Nos. 1, 2, and 3. Pathfinder responds that it timely accepted Great Western's offer, which created a legally binding contract; that the June 1, 2004 offer did not include any conditions precedent; and that, even if the offer contained conditions precedent, Pathfinder performed all obligations necessary to form a binding contract.

We review a trial court's decision to deny a JNOV under the legal sufficiency standard of review.[4] *Tanner v. Nationwide Mut. Fire Ins. Co.*, 289 S.W.3d 828, 830 (Tex. 2009); *see also City of Keller v. Wilson*, 168 S.W.3d 802, 823 (Tex. 2005) (test for legal sufficiency is same for directed verdict, JNOV, and appellate no-evidence review). The evidence is legally sufficient if it "would enable reasonable and fair-minded people to reach the verdict under review." *City of Keller*, 168 S.W.3d at 827.

We review the evidence in the light most favorable to the verdict. *JBS Carriers, Inc. v. Washington*, 564 S.W.3d 830, 841–42 (Tex. 2018). In our analysis, we credit favorable evidence if reasonable jurors could and disregard contrary evidence unless reasonable jurors could not. *Cruz v. Andrews Restoration, Inc.*, 364 S.W.3d 817, 819 (Tex. 2012). Because Great Western has challenged the legal sufficiency of the evidence to support an adverse jury finding on an issue on which it did not have the burden of proof at trial, it must demonstrate that there is no evidence to support the adverse finding. *Exxon Corp. v. Emerald Oil & Gas Co., L.C.*, 348 S.W.3d 194, 215 (Tex. 2011). We will uphold the jury's finding if it is

---

[4]Although the record does not contain a written ruling on the motion for JNOV, Great Western objected to the trial court's failure to rule. *See* TEX. R. APP. P. 33.1(a)(2)(B).

supported by more than a scintilla of competent evidence. *Tanner*, 289 S.W.3d at 830.

Great Western first asserts that, in Question No. 1, the trial court interpreted the offer in the June 1, 2004 letter to have three material terms. Relying on *Burbage v. Burbage*, 447 S.W.3d 249, 260 (Tex. 2014), Great Western contends that the jury charge "sets the standard" for the analysis of the contract and that, as submitted to the jury, there could not be a binding contract until all three acts were complete.

In Question No. 1, the trial court instructed the jury:

> A. To form a valid agreement, the parties must have the same understanding of the subject matter of the agreement and all its essential terms.
>
> B. During negotiations, the parties may agree to some terms of the agreement with the expectation that other terms are to be agreed on later. Such an expectation does not prevent the agreement already made from being an enforceable agreement, if the circumstances indicate the parties intend to be bound.
>
> C. Time of performance is not an essential term. If an agreement does not specify a time of performance, then a reasonable time can be inferred.
>
> D. In deciding whether the parties reached an agreement, you may consider what they said and did in light of the surrounding circumstances, including any earlier course of dealing. You may not consider the parties' unexpressed thoughts or intentions.

The jury was then asked:

> Do you find that the letter of June 1, 2004, was an agreement between Great Western and Pathfinder whereby:
>
> > 1. Great Western would convey to Pathfinder a 25% interest in the leases covering Labors 1 & 10, League 29, Rusk Co. School Lands, Hockley County, Texas;

2. Such 25% interest would include an interest, if any, which Pathfinder may be obligated to convey to the Kennedy Group; and

3. Great Western and Pathfinder would execute a joint operating agreement or participation agreement which would include a provision requiring Pathfinder to obtain the written consent of Great Western prior to assignment of any portion of such 25% interest to any third party, other than the Kennedy Group.

The jury answered, "yes."

We agree with Great Western that *Burbage* stands for the proposition that, absent an objection, the jury charge sets the standard for appellate review of the legal sufficiency of the evidence. 447 S.W.3d at 260 (citing *Osterberg v. Peca*, 12 S.W.3d 31, 55 (Tex. 2000) ("[I]t is the court's charge, not some other unidentified law, that measures the sufficiency of the evidence when the opposing party fails to object to the charge.")).[5] However, we disagree with Great Western that, in Question No. 1, the trial court, as a matter of law, construed the June 1, 2004 letter to require that the resolution of the interest of the Kennedy Group in the leases on Labors 1 and 10 and that the execution of a joint operating or participation agreement were "material, essential prerequisites" or "conditions precedent" to the formation of a binding contract.

In Question No. 1, the trial court did not define "condition precedent" for the jury, did not determine that any act was a condition precedent to contract formation, and did not ask the jury if all conditions precedent had been performed. Rather, the trial court instructed the jury that the parties could reach an agreement with

_____

[5]Although it is not essential to our analysis, we note that Pathfinder objected to the submission of Question No. 1 to the jury and requested that the trial court submit an issue that asked only if the June 1, 2004 letter was an enforceable contract when Pathfinder returned it to Great Western. The trial court overruled Pathfinder's objection and denied the requested submission.

14

the intent that further terms could be agreed upon at a later time. The trial court then substantively tracked the language of the June 1, 2004 letter and asked the jury whether Great Western and Pathfinder intended to reach an agreement.[6] We see nothing in the language of Question No. 1 that indicates that the trial court determined, as a matter of law, that all three "acts" had to be performed before a valid contract existed.

We, therefore, turn to Great Western's argument that the trial court erred by not granting the motion for JNOV because the June 1, 2004 letter contained two conditions precedent to contract formation—the inclusion of the Kennedy Group and the execution of the JOA—that were not met. Pathfinder responds that those two terms of the June 1, 2004 letter were covenants, not conditions precedent, and did not affect the formation of a contract.

The existence of a valid contract is one of the elements of Pathfinder's breach of contract claim. *See Pathfinder Oil & Gas*, 574 S.W.3d at 890. To establish that the June 1, 2004 letter was a valid agreement, Pathfinder had to establish: (1) an offer; (2) an acceptance in strict compliance with the terms of the offer; (3) a meeting of the minds; (4) each party's consent to the terms; and (5) because the letter was a written contract, execution and delivery of the contract with the intent that it be mutual and binding. *Turner v. NJN Cotton Co.*, 485 S.W.3d 513, 521 (Tex. App.—Eastland 2015, pet. denied). Generally, whether the parties intended to create a contract only upon the satisfaction of a condition precedent is a question of fact. *Foreca, S.A. v. GRD Dev. Co.*, 758 S.W.2d 744, 746 (Tex. 1988); *see also R.R.*

---

[6]The June 1, 2004 letter did not state that Pathfinder's obligation to obtain the written consent of Great Western prior to the assignment by Pathfinder of any portion of its interest in the leases would be included in the contemplated participation agreement. However, the trial court instructed the jury that the participation or joint operating agreement would contain such a provision, and we will base our analysis on the trial court's instruction. Further, whether the JOA was required to contain such a provision does not impact Great Western's argument that the execution of the JOA was a condition precedent to contract formation.

*Comm'n of Tex. v. Gulf Energy Expl. Corp.*, 482 S.W.3d 559, 572–73 (Tex. 2016) (reiterating that the determination of whether a "contemplated formal document" was a condition precedent to the formation of a contract depended on the intent of the parties, "which is usually a question for the trier of fact").

"A condition precedent is an event that must happen or be performed before a right can accrue to enforce an obligation." *Centex Corp. v. Dalton*, 840 S.W.2d 952, 956 (Tex. 1992) (citing *Hohenberg Bros. Co., v. George E. Gibbons & Co.*, 537 S.W.2d 1, 3 (Tex. 1976)); *see also In re Estate of Tatum*, 580 S.W.3d 489, 493 (Tex. App.—Eastland 2019, pet. filed). It may be either a condition to the formation of a contract or to an obligation to perform an existing agreement. *Dillon v. Lintz*, 582 S.W.2d 394, 395 (Tex. 1979). For there to be a condition precedent to contract formation, the parties must have agreed that a contract will not be effective or binding until certain conditions occur. *Parkview Gen. Hosp., Inc. v. Eppes*, 447 S.W.2d 487, 490–91 (Tex. App.—Corpus Christi–Edinburg 1969, writ ref'd n.r.e.).

In contrast, a covenant is "an agreement to act or refrain from acting in a certain way." *Solar Applications Eng'g, Inc. v. T.A. Operating Corp.*, 327 S.W.3d 104, 108 (Tex. 2010). "Breach of a covenant may give rise to a cause of action for damages, but does not affect the enforceability of the remaining provisions of the contract unless the breach is a material or total breach." *Id.*

We determine whether a contractual provision is a condition precedent or a covenant through an examination of the entire contract to determine the parties' intent. *Criswell v. European Crossroads Shopping Ctr., Ltd.*, 792 S.W.2d 945, 948 (Tex. 1990); *see also Solar Applications*, 327 S.W.3d at 109. "Our goal is to determine whether the parties intended that the right or responsibility at issue be conditional." *Arbor Windsor Court, Ltd. v. Weekley Homes, LP*, 463 S.W.3d 131, 136 (Tex. App.—Houston [14th Dist.] 2015, pet. denied).

When we conduct our review, we consider that, "[b]ecause of their harshness in operation, conditions are not favorites of the law." *Criswell*, 792 S.W.2d at 948; *see also Houston Indep. Sch. Dist. v. Simpson*, No. 03-12-00145-CV, 2013 WL 5878919, at *6 (Tex. App.—Austin Nov. 1, 2013, no pet.) (mem. op.) (noting that conditions precedent to contract formation are disfavored under Texas law). "In construing a contract, forfeiture by finding a condition precedent is to be avoided when another reasonable reading of the contract is possible." *Criswell*, 792 S.W.2d at 948; *Lucas v. Coomer*, No. 02-09-00152-CV, 2010 WL 5118023, at *5 (Tex. App.—Fort Worth Dec. 16, 2010, no pet.) (mem. op.) (noting that, because forfeitures are not favored, a court should avoid finding a condition precedent to contract formation if another reasonable reading of the contract is possible). "Thus, if the language of the contract is susceptible to a non-condition precedent interpretation, we accept that construction and construe the language as a mere covenant." *Arbor Windsor Court*, 463 S.W.3d at 136–37; *see also Reilly v. Rangers Mgmt., Inc.*, 727 S.W.2d 527, 530 (Tex. 1987) ("Courts will not declare a forfeiture unless they are compelled to do so by language which can be construed in no other way.").

Contract terms that use conditional language such as "if," "provided that," "on condition that," or similar conditional phrases reflect the parties' intent to create a condition precedent. *Criswell*, 792 S.W.2d at 948. The absence of such language is at least some indication that a provision should be construed as a covenant. *Id.* ("While there is no requirement that such phrases be utilized, their absence is probative of the parties['] intention that a promise be made, rather than a condition imposed."); *see also Schwarz-Jordan, Inc. v. Delisle Constr. Co.*, 569 S.W.2d 878, 881 (Tex. 1978) (concluding that terms "shall" and "upon approval" were "not those usually associated with a condition precedent"); *Arbor Windsor Court*, 463 S.W.3d

17

at 137. Further, the conditional language must connect the condition precedent to the conditional obligation. *See Solar Applications*, 327 S.W.3d at 110 (rejecting proposition that conditioning some obligations necessarily operates to condition others); *Arbor Windsor Court*, 463 S.W.3d at 137.

Great Western first asserts that, before a binding contract was formed, Pathfinder was required to "indicate what interest the Kennedy Group would have (or provide a written disclaimer from Kennedy)." However, the June 1, 2004 letter stated only that the offered 25% interest was "inclusive of any interests which [Pathfinder] may be obligated to convey" to the Kennedy Group. Great Western did not offer the 25% interest in the leases only "if" Pathfinder included the Kennedy Group in the purchase or "contingent upon" Pathfinder either telling Great Western that the Kennedy Group would participate or providing a written disclaimer from the Kennedy Group. Rather, Great Western simply informed Pathfinder that, if Pathfinder elected to participate in the purchase and if it had any obligation to include the Kennedy Group in the purchase, then Pathfinder was required to assign a portion of its 25% interest to satisfy that obligation. In other words, when it signed the June 1, 2004 letter, Pathfinder promised to act in a certain way after it was assigned the 25% interest in the leases. Therefore, this provision was a covenant, not a condition precedent to contract formation.[7]

Great Western next contends that the negotiation and execution of the JOA was a condition precedent to contract formation because the acquisition of the leases cannot be segregated from the development of the leases; "would," as used by the

---

[7]Great Western also argues that, because Pathfinder continued to request an additional 3% interest in the leases, there was no agreement that Great Western would assign a 25% interest to Pathfinder. However, Heathington, in his October 11, 2004 letter, discussed the "additional . . . 3%," and Ashford testified that Great Western and Pathfinder "hadn't reached any kind of solid ground" on "the additional interest" that he was "trying to get [Great Western] to provide." We fail to see how negotiations to acquire an additional 3% interest impact whether Pathfinder was entitled to receive a 25% interest under the June 1, 2004 letter.

18

trial court in Question No. 1, is the functional equivalent of "if" or "subject to"; and, although the June 1, 2004 letter provided that a written consent provision would be included in the JOA, it did not require an immediate grant of a property right and said nothing about "immediate conveyance without the 'required' agreement in the JOA."

"[P]arties may agree upon some of the terms of a contract, and understand them to be an agreement, and yet leave other portions of an agreement to be made later." *Scott v. Ingle Bros. Pac., Inc.*, 489 S.W.2d 554, 555 (Tex. 1972). However, when an essential term is left open for future negotiations, there is no binding contract. *T.O. Stanley Boot Co. v. Bank of El Paso*, 847 S.W.2d 218, 221 (Tex. 1992); *see also Fort Worth Indep. Sch. Dist. v. City of Fort Worth*, 22 S.W.3d 831, 846 (Tex. 2000) ("It is well settled law that when an agreement leaves material matters open for future adjustment and agreement that never occur, it is not binding upon the parties and merely constitutes an agreement to agree."). A term is essential if the parties would reasonably regard it as a vitally important element of the bargain. *Gen. Metal Fabricating Corp. v. Stergiou*, 438 S.W.3d 737, 744 (Tex. App.— Houston [1st Dist.] 2014, no pet.). The question of what terms are essential to a contract is determined on a case-by-case basis and depends on the subject matter of the contract at issue. *Fischer*, 479 S.W.3d at 237; *see T.O. Stanley Boot*, 847 S.W.2d at 221.

In the June 1, 2004 letter, Great Western referenced the need for the parties to execute a participation agreement "as soon as reasonably possible." However, Great Western did not specifically condition Pathfinder's election to acquire the 25% interest in the leases on either the preparation or the execution of a participation agreement. *See Hardman v. Dault*, 2 S.W.3d 378, 380–81 (Tex. App.—San Antonio 1999, no pet.) (pointing to lack of "subject to" language and holding that settlement

19

agreement was binding despite noncompliance with provision that required final documents to be signed by a certain date); *Capitol Wireless, LP v. XTO Energy, Inc.*, No. 02-12-00351-CV, 2014 WL 3696084, at *4–5 (Tex. App.—Fort Worth July 24, 2014, no pet.) (mem. op.) (holding that terms of participation agreement to drill well contained all material terms even though parties contemplated that a joint operating agreement would be executed later).

Further, there is more than a scintilla of evidence that Great Western and Pathfinder intended to be immediately bound by the June 1, 2004 agreement. Great Western required Pathfinder to elect to purchase the 25% interest in the Labors 1 and 10 leases within 48 hours of its receipt of the June 1, 2004 letter "insofar as the Airport [sic] No. 2 well is drilling on an offset tract." The June 1, 2004 letter indicated that Great Western had not prepared a participation agreement for the development of the leases that could be executed within the 48-hour acceptance period. Further, Muire testified that Great Western "wanted a commitment" from Pathfinder as to the acquisition of the 25% interest before Pathfinder knew whether the Airfield Number 2 would be a successful well. Great Western, therefore, intended that Pathfinder would be bound by its election to purchase the 25% interest without the execution of the JOA.

Finally, according to Peppiatt, the 25% interest was a "done deal." Peppiatt also testified that, "in the oil patch," once an agreement like the June 1, 2004 letter was signed, "it was a binding agreement" and the parties "went forward to a joint operating agreement" to negotiate "minor things." Indeed, the JOA ultimately prepared by Great Western contemplated that Pathfinder already owned an interest in the leases and addressed how the parties would share the costs of drilling multiple wells on Labor 1. The JOA, therefore, was premised on the existence of a binding agreement as to the ownership of the leases on Labors 1 and 10 and governed the

20

parties' conduct under that agreement. Accordingly, the execution of the JOA was not an essential term to the formation of a contract on June 1, 2004.

We hold that, viewed in the light most favorable to the verdict, the evidence is legally sufficient to support the jury's finding that the June 1, 2004 letter was a binding agreement. Further, there is no evidence that Great Western revoked the June 1, 2004 offer before it was accepted by Pathfinder on June 2, 2004. Therefore, the trial court did not err when it failed to grant Great Western's motion for JNOV on the ground that there is legally insufficient evidence of a binding contract.

Great Western also asserts under Issue 1 in the "Issues Presented" section of its brief that the evidence is legally insufficient to support the jury's answers to Question Nos. 2 and 3, which inquired whether Pathfinder or Great Western breached the June 1, 2004 agreement. Great Western did not include any substantive argument on this sub-issue in its brief and, therefore, waived this complaint on appeal.[8] *See* TEX. R. APP. P. 38.1(i); *RSL Funding, LLC v. Newsome*, 569 S.W.3d 116, 126 (Tex. 2018) (noting that failure to provide citation or argument and analysis for contentions on appeal can result in waiver). We overrule Great Western's first issue.

### B. The Parties' Stipulations

In its third issue, Great Western contends that the trial court erred when it awarded Pathfinder monetary damages and prejudgment interest because, by stipulation, the parties withdrew the determination of sums due from the case and because no competent evidence supports the award. Alternatively, Great Western

---

[8]It appears that Great Western may have challenged the legal sufficiency of the jury's answers to Question Nos. 2 and 3 as an oversight. The brunt of Great Western's challenge to the jury's answers to Question Nos. 2 and 3 is the contention that those answers were immaterial. Great Western's "immaterial" contention is premised on its assertion that it withdrew its offer to Pathfinder prior to acceptance—an assertion that we have rejected with respect to Great Western's challenge to the jury's answer to Question No. 1. Thus, we conclude that the jury's answers to Question Nos. 2 and 3 were not immaterial.

argues that the trial court erred when it awarded prejudgment interest because the record does not establish a definite amount due and owing upon which to compute interest and when it ordered an accounting after it awarded monetary relief and dismissed Pathfinder's claim for accounting.

Paragraph 3 of the parties' stipulations provided:

3.     In the event that the Court or a jury finds that the Letter Agreement is an enforceable agreement, that Great Western breached the Letter Agreement, and that Pathfinder is entitled to recover for Great Western's breach, the following will control the relief awarded to Pathfinder:

a.     Pathfinder will be entitled to the remedy of specific performance, requiring Great Western to convey to Pathfinder an undivided 25% of the oil and gas leases covering Labors 1 and 10, League 29, Rusk County School Land, Hockley County, Texas, as sought in Count 1 of Pathfinder's Second Amended Counterclaim.

b.     Pathfinder hereby elects the remedy of specific performance and waives its claim of money damages, as sought by Count 2 of Pathfinder's First Amended Counterclaim.

c.     Pathfinder will re-execute the September 1, 2004 Operating Agreement prepared by Great Western and forwarded to Pathfinder by letter dated September 20, 2004, which Operating Agreement will govern operations on Labors 1 and 10.

d.     Great Western will provide Pathfinder with an accounting of actual out of pocket expenses incurred in connection with the acquisition of the oil and gas leases, and in connection with the drilling, completing, equipping and operating of any well drilled by Great Western on Labors 1 and 10 since June 1, 2004, along with an accounting of all revenue received by Great Western on the production of hydrocarbons from any of such well[s]. The actual out of pocket expenses charged to Pathfinder's 25% interest will be those permitted under the terms and provision of the September 1, 2004

22

Operating Agreement and the COPAS[9] Accounting Procedure attached thereto as Exhibit "C".

e. Pathfinder will dismiss without prejudice that portion of its counterclaim seeking an accounting. In the event the parties are unable to agree upon the accounting, and it is necessary for either party to file a lawsuit in connection with the accounting, neither party will assert the defenses of res judicata, collateral estoppel, issue preclusion, compulsory counterclaim or other defense arising out of assertion, or non-assertion, of such claims in this litigation.

f. Great Western will provide a simple calculation of the revenue and expenses, as listed herein above in paragraph d. from inception to the most recent accounting period before trial. Great Western will forward the representative proceeds in the amount representing Pathfinder's twenty-five (25%) percent interest for all historical production. Same shall be forwarded to Pathfinder's Counsel, listed below, within 15 days of the judgment, subject to appeal, including Great Western's right to post a supersedeas bond.

Great Western first argues that the trial court erred when it awarded Pathfinder monetary damages because, pursuant to the stipulations, Pathfinder waived its right to recover money damages in this proceeding and can recover money damages only through the postjudgment accounting procedure set out in the stipulations. Generally, damages are an "alternative remedy available only when specific performance either is not sought or is not available." *Paciwest, Inc. v. Warner Alan Props., LLC*, 266 S.W.3d 559, 575 (Tex. App.—Fort Worth 2008, pet. denied); *see also Hays Street Bridge Restoration Grp. v. City of San Antonio*, 570 S.W.3d 697, 707 (Tex. 2019). However, in appropriate circumstances, a trial court "may order, in addition to specific performance, payment of expenses incurred by

---

[9]"COPAS" is the Council of Petroleum Accountants Societies. *See Allen Drilling Acquisition Co. v. Crimson Expl. Inc.*, 558 S.W.3d 761, 780–81 (Tex. App.—Waco 2018, pet. denied).

plaintiffs as a result of a defendant's late performance." *Paciwest*, 266 S.W.3d at 575. Such compensation "is not considered breach of contract damages, but rather 'equalizes any losses occasioned by the delay by offsetting them with money payments.'" *Id.* (quoting *Heritage Hous. Corp. v. Ferguson*, 674 S.W.2d 363, 366 (Tex. App.—Dallas 1984, writ ref'd n.r.e.)). A monetary award in the nature of an "accounting between the parties pending performance of the contract" may be recovered in connection with an award of specific performance. *Id.*

The trial court awarded Pathfinder $3,053,023.40 as a "result of the specific performance" of the contract by the parties. Therefore, the trial court did not award Pathfinder monetary damages in violation of the parties' stipulations.

Great Western next argues that there is no competent evidence to support the trial court's award of $3,053,023.40 because the parties stipulated that any monies due would be verified under the COPAS standards and the only evidence of historical net revenue offered to the trial court did not meet that standard. In paragraph (3)(b) of the stipulations, the parties agreed that Great Western would provide Pathfinder with an accounting of revenue and expenses from the wells on Labors 1 and 10 that complied with a specific COPAS accounting procedure. However, pursuant to paragraph (3)(f) of the stipulations, Great Western was also required to provide Pathfinder with a "simple calculation of the revenue and expenses" from inception to the most recent accounting period before trial. Great Western was required to forward the "representative proceeds in the amount representing Pathfinder's twenty-five (25%) percent interest for all historical production" from that simple calculation to Pathfinder "within 15 days of the judgment, subject to appeal, including Great Western's right to post a supersedeas bond."

We must give effect to all parts of the parties' stipulations. *See Exxon Mobil*, 568 S.W.3d at 657. Pursuant to paragraph (3)(f) of the stipulations, Great Western and Pathfinder agreed that, absent an appeal by Great Western, in which it could supersede the judgment, Pathfinder would receive an approximate amount of its share of the historical net revenue soon after judgment. Great Western would not need the right to supersede the amount owed from the simple calculation unless the parties intended that the amount would be included in the trial court's judgment. *See* TEX. R. APP. P. 24.1, 24.2. The postjudgment accounting proceedings set out in paragraphs (3)(d)–(e) of the parties' stipulations would then be used to resolve any issues with the amount owed to Pathfinder that remained after the "simple calculation."

Great Western prepared the "simple calculation" and forwarded it to Pathfinder prior to the hearing on Pathfinder's motion for attorneys' fees and for entry of judgment. Pathfinder submitted Great Western's calculation to the trial court, and paragraph (3)(f) of the parties' stipulations allowed the trial court to award the amount of that calculation in the judgment. On this record, we cannot conclude that the trial court erred when it included relief in the judgment that Pathfinder was entitled to receive under the parties' stipulations. *See Houston Laureate Assocs., Ltd. v. Russell*, 504 S.W.3d 550, 567–68 (Tex. App.—Houston [14th Dist.] 2016, no pet.) (noting that, under the doctrine of invited error, a party cannot complain that the trial court committed error when it rendered judgment that complied with the parties' stipulations).

Alternatively, Great Western argues that, even if the trial court properly awarded the historical net revenue in the judgment, it erred when it awarded prejudgment interest on that amount because the calculation of historical net revenue was not a definite sum determined to be due and payable at a date certain prior to

25

judgment. A trial court may award prejudgment interest under an enabling statute or under its general principles of equity. *Johnson & Higgins of Tex., Inc. v. Kenneco Energy, Inc.*, 962 S.W.2d 507, 528 (Tex. 1998); *Trevino v. City of Pearland*, 531 S.W.3d 290, 297 (Tex. App.—Houston [14th Dist.] 2017, no pet.). Prejudgment interest is "recoverable as a matter of right where an ascertainable sum of money is determined to have been due and payable at a date certain prior to judgment." *Republic Nat'l Bank v. Nw. Nat'l Bank*, 578 S.W.2d 109, 116 (Tex. 1979) (op. on reh'g); *see also In re W.R.B.*, No. 05-12-00776-CV, 2014 WL 1008222, at *6 (Tex. App.—Dallas Feb. 20, 2014, pet. denied) (mem. op.). The award of equitable prejudgment interest on a monetary award grounded in specific performance is in the sound discretion of the trial court. *W. Beach Marina, Ltd. v. Erdeljac*, 94 S.W.3d 248, 266–67 (Tex. App.—Austin 2002, no pet.); *see also Paciwest, Inc. v. Warner Alan Props., LLC*, No. 02-10-00378-CV, 2012 WL 3499603, at *7 (Tex. App.— Fort Worth Aug. 16, 2012, pet. denied) (mem. op.).

Great Western and Pathfinder agreed in paragraph (3)(f) of the stipulations that Pathfinder was entitled to recover monetary relief based on Great Western's "simple calculation." Great Western calculated Pathfinder's share of historical net revenue from the wells on Labors 1 and 10 as well as the prejudgment interest that was due on that amount. We cannot conclude that the trial court abused its discretion when it determined that Great Western's calculation of historical net revenue was sufficient evidence of a definite sum that was due and payable on a date certain so as to support an award of prejudgment interest.

Finally, Great Western argues that the trial court erred when it awarded Pathfinder monetary relief and also required an accounting. Paragraph (3)(e) of the parties' stipulations required Pathfinder to dismiss its counterclaim for an accounting. Pursuant to this provision, the trial court dismissed

Pathfinder's affirmative claim for an accounting.  However, paragraph (3)(d) of the stipulations required Great Western to provide Pathfinder with an accounting.  The trial court incorporated this stipulation into the judgment almost verbatim.  Pursuant to the parties' stipulations, Pathfinder was entitled to both an accounting and to 25% of the net historical revenues based on Great Western's "simple calculation."  We cannot conclude that the trial court erred when it included in the judgment all relief that the parties stipulated that Pathfinder was entitled to receive.  *See Russell*, 504 S.W.3d at 567–68.  We overrule Great Western's third issue.

*This Court's Ruling*

We affirm the trial court's judgment.


JOHN M. BAILEY

CHIEF JUSTICE

January 23, 2020

Panel consists of: Bailey, C.J.,
Stretcher, J., and Wright, S.C.J.[10]

Willson, J., not participating.

---

[10]Jim R. Wright, Senior Chief Justice (Retired), Court of Appeals, 11th District of Texas at Eastland, sitting by assignment.